[Crim. No. 22786. Aug. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES LESLIE KARIS, JR., Defendant and Appellant.

[Crim. No. 25929. Aug. 29, 1988.]

In re JAMES LESLIE KARIS, JR., on Habeas Corpus.

616

618

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Roy M. Dahlberg and Musawwir Spiegel, Deputy State Public Defenders, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi, Edmund D. McMurray and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EAGLESON, J.—Defendant was convicted by a jury in the Sacramento County Superior Court of the first degree murder (Pen. Code, §§ 187, 189)[1] of Peggy Pennington, with special circumstances of murder in the commission of kidnapping and in the immediate flight from rape (§ 190.2, subd. (a)(17) (count I);[2] the attempted murder of Patricia D. (§§ 664/187) (count II); the kidnapping of Ms. Pennington (count III) and Ms. D. (count IV) (§ 207); and rape of Ms. D. (§ 261) (count V). He was found to have personally used a firearm in the commission of each offense (§ 12022.5), and to have intentionally inflicted great bodily injury in the commission of the attempted murder and kidnapping offenses (§ 12022.7). The jury returned a verdict of death for the murder.

---

[1] Unless otherwise indicated all statutory references herein are to the Penal Code.

[2] The jury verdict found defendant guilty of first degree murder as a felony murder and as a murder committed willfully and with deliberation and premeditation.

Defendant admitted a charge that he had suffered a prior conviction for rape in 1976 in Santa Clara County and had served a term of imprisonment for that offense. (§§ 667.5, subd. (a), and 667.6, subd. (a).) The court then found true a second allegation of prior conviction, finding that defendant had been convicted of another rape in Orange County in 1971, and had also served a prison term for that offense.[3] After denying the motion for modification of the death penalty verdict (§ 190.4), the court imposed the judgment of death, and sentenced defendant to aggregate terms of 41 years for the other offenses and enhancement allegations.

This appeal is automatic. (§ 1239.)

Defendant also petitions for writ of habeas corpus asserting that his trial counsel failed to provide constitutionally adequate representation. Because defendant makes the same claim in his appeal, we issued an order to show cause and consider the habeas corpus petition in conjunction with the appeal. We conclude that defendant's assertions of error at the guilt phase of the trial lack merit, that no prejudicial error occurred thereafter, and that he has failed to establish a basis for habeas corpus relief. Accordingly we shall affirm the judgment in its entirety and deny the petition for writ of habeas corpus.

I

A. *Guilt Phase Evidence: The Prosecution Case.*

The offenses of which defendant was convicted occurred on July 8, 1981, when the victims were taking a brief walk during a midmorning break from their jobs at the El Dorado County Welfare Department in Placerville. About 10:30 a.m. they were accosted by a man, identified by Ms. D. as defendant, who jumped out of a car and ordered them at gunpoint to get into the car. They complied, entering the back seat. Defendant drove for some distance, from Highway 50, Coloma Road, and Highway 49, onto Highway 193. The car left Highway 193 and continued for a mile and one-half on Rock Creek Road to a point where defendant drove off the road, stopped the car, and ordered the two women to walk down a dirt path to an overgrown creek bed. They followed the creek bed to an area where defendant ordered the women to disrobe. A car driving at normal speed from the

---

[3]Defendant challenged the validity of this prior conviction on grounds that his plea of guilty, entered in the Municipal Court of the West Orange County Judicial District was not taken in conformity with the requirements of *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]. After reviewing defendant's written waiver of rights, the court determined that the waiver satisfied the requirements of *Tahl,* and found that he had suffered the prior conviction, had served a prison term therefor, and had not remained free of confinement for a 10-year period. The court also found that defendant had served separate prison terms for the two priors.

site of the abduction would reach the place where the victims left the car, a distance of 5.9 miles from the welfare department, in 15 minutes. The walk up the creek bed to the location of the shooting would take between five and ten minutes.

At defendant's direction, Ms. D. tied the hands of Ms. Pennington with the latter's hose. Defendant tightened the bonds, and then gagged Ms. Pennington with a bandana. He then raped Ms. D., after which he untied Ms. Pennington, and ordered the women to continue walking along the creek bed. When they reached a large hole, defendant ordered both victims to get into the hole. In reply to Ms. D.'s plea that she not be killed, defendant stated that he had to kill them so that he would not be killed.

The women turned away from defendant at his orders, after which Ms. D. heard five shots. She felt a numbness in her neck after the second shot and felt the impact of a second bullet in her neck with the fourth shot. She feigned death, lying down, and heard defendant throwing rocks on Ms. Pennington and on her own head. Then, after hearing defendant leave and waiting for from five to ten minutes, Ms. D. made her way back to Rock Creek Road where a gravel-truck driver drove her to the highway, and flagged down a car whose driver took her on to Chili Bar where the sheriff and medical help were summoned.

The first driver remained at the intersection of the highway and Rock Creek Road to guide emergency personnel. He and a deputy sheriff who arrived within 15 minutes were able to follow the trail left by Ms. D. By the time they had located Ms. Pennington, they had been joined by paramedics and firemen. A paramedic who examined Ms. Pennington at the scene determined that she was dead. A subsequent examination established that the cause of death was one of three bullet wounds she suffered and a fracture through the base of her skull.[4]

Ms. D. had suffered a potentially life-threatening bullet wound to her neck and an abrasion on the back of her skull. She was taken to a local hospital and thereafter transferred to the Sacramento Medical Center. Her first description of her assailant, to the gravel truck driver who picked her up, was a man with long dark hair and a green car. Although the truck driver did not recall her so stating, the deputy sheriff who met him testified

---

[4]The murder victim suffered multiple injuries, including many bruises and abrasions on her face and left neck. She had five lacerations on her head, the most severe of which almost severed her left ear. In addition she had suffered three gunshot wounds, two to her back and one in the back of her neck, as well as the "large" skull fracture. The bullet which entered her neck traveled upward and lodged in her brain. She probably lived no longer than 12 minutes after suffering this injury.

that she had stated the assailant was Mexican.[5] One or two days after the shooting, after tubes had been removed from her throat, Ms. D. was able to speak to a detective. At that time she described the assailant as having dark skin or olive complexion, possibly Indian or Italian, with a "Fu Manchu" style moustache, a two-day growth of beard, and shoulder length hair; and as being about five feet nine inches to five feet ten inches tall, of husky or stocky build. At trial she testified that she had told the officer that she did not know his nationality, but the man "could be Mexican . . . could be Indian, Italian, there is—just dark skinned, he had dark hair." On July 14, 1981, without any knowledge that a suspect's photo was included among several shown to her, and having heard or seen nothing in the media or any other source regarding identifying features of a suspect, Ms. D. positively identified a 1976 photo of defendant, noting in particular his eyes. She positively identified defendant at the preliminary hearing and at trial, although he had shaved, cut his hair, and wore glasses. In the interim she had identified several other photos of defendant, pointing out differences in the hair length, moustache, and beard growth.

Analysis of a stain on Ms. D.'s panties indicated that seminal fluid was present. Further analysis established that it came from a person having a PGM enzyme type $1 + 2 +$, which is common to approximately 23 percent of the population, including defendant, and came from a "non-secretor" who does not exhibit markers of his ABO (blood) type in other body fluids. Defendant is a nonsecretor. The percentage of nonsecretors who produce type $1 + 2 +$ PGM in the population is approximately 4 percent. One out of four persons in the population could have been the donor of the seminal fluid found in the stain. Analysis of the blood and saliva of Ms. D.'s husband eliminated him as the source of the seminal fluid.

Ms. D. had described the car in which she had been abducted as an old, large car of American make, two-door, and green in color. On July 8, defendant's parole agent told local police that defendant drove a 1975 Chevrolet Impala, license 807 PSF. That evening, having failed to locate the car at defendant's residence, Deputy Sheriff Allen, waiting near the entrance to defendant's driveway, observed a two-door Chevrolet, partial license 807, approach. The driver was defendant's half-brother, Kevin Jones. Later that night Ms. D. was asked to describe any objects she remembered seeing in the car. On the morning of July 9, 1981, neither defendant nor the car was at defendant's residence, the home he shared with his mother and half-brother on a former boys' ranch in El Dorado County. The car was located there in the late afternoon, however. An officer observed two pillows and a "cool cushion" in the back seat, items which Ms. D. identified as

---

[5] Defendant is not of Mexican descent.

appearing to be the same black cool cushion and other cushions she had seen in her assailant's car. The car, which was the Karis family car, was impounded by officers who also seized 50 to 60 marijuana plants found growing in buckets in the rear of a building across from defendant's house. The car, which had a vinyl top and was silver or gray in color, appeared to be green, tan, or light brown at night when illuminated by headlights or parking lights.

Some time after 8 p.m. on July 8, 1981, Kevin Jones and his girlfriend Dana Skelton, returning from a visit to her grandmother in Kelsey, drove to the house. Dana testified that after Kevin stopped to speak to a deputy sheriff who was parked at the foot of the driveway about a quarter of a mile from the house, he drove on up to the house and spoke to his mother. He then returned to the car and told Dana that he had to take her home, and that they had to put defendant in the trunk because defendant was dealing in cocaine. After leaving the house, Kevin stopped, Dana met defendant, and defendant joined them in the passenger compartment of the car. Defendant had a moustache and a little bit of beard at the time when Dana met him. They drove to the home where Dana lived with her grandmother who gave permission for defendant and Kevin to remain overnight. On the next morning, although Kevin had promised Dana when she awoke at 6:30 a.m. that he would drive her to work, he told her he could not do so because his brother had to leave. The two men left ten minutes later.

Dana's grandmother described the man who had stayed at her home as having a fairly long moustache and dark hair. She identified a photo of defendant as similar to that man, but his moustache was longer.

A neighbor, David Marden, who lived in the other half of the duplex building shared with the Karis family, saw defendant driving up to the house much faster than he had ever seen him drive before on an afternoon that was determined to be July 8, 1981. It was also determined that this occurred between 3 and 3:30 p.m. The same neighbor testified that defendant was growing the marijuana plants the officers had seized, and was paranoid about them. The neighbor had believed defendant left the family home out of fear regarding their discovery.

On July 9, 1981, defendant arrived unexpectedly during the noon hour at the home Peggy Steuben shared with Jay Raugust, who was a friend of defendant, and whose home defendant visited about once a month to work with Raugust making jewelry and other crafts and to talk. On this occasion defendant was quiet, withdrawn, and clean shaven. When Ms. Steuben had last seen defendant on July 5, 1981, he had a full beard and a moustache. When she jokingly asked defendant if he was on the run, he said he did not

want to talk about it, said he needed to get away for a few days, and asked if he could stay with them. Ms. Steuben refused, but when she returned to the house from work at 6 p.m., defendant was still there. He left about 7:30 p.m.

Ms. Steuben also testified, over objections that the statements were hearsay and more prejudicial than probative, that defendant had visited them on the July 4, 1981, weekend, and that during a conversation about keeping a gun for self-defense, defendant had stated that he could understand that if someone committed a serious crime, it could be necessary to have a gun to kill witnesses and avoid apprehension. He stated that he had been in prison and would consider it self-defense to kill anyone who might send him back. He thought rape was an example of a serious crime.

Prior to the trial, Kevin had suffered a stroke. Pursuant to stipulation that he was physically and mentally incompetent to testify, portions of his preliminary hearing testimony were read to the jury, without objection by defense counsel.[6] In that testimony Kevin said that he, defendant, and their mother, Eva Jones, lived together, and each had access to the family car, a 1975 Impala. On the morning of July 8, 1981, he, his mother, and defendant went to Placerville to cash a check at the Lucky Market, and went on to the post office to buy a money order. They drove back to their home between 9:30 and 10 a.m. Defendant and Kevin remained there until evening except for checking the mail and a visit to Georgetown where they had a couple of beers. Kevin testified that defendant did not have a moustache that morning, and had shaved his moustache off a week before.

Kevin also testified that he had spent the night of July 8, 1981, at the home of Dana Skelton. On July 9, 1981, he arrived home about 8 a.m. Defendant was just getting up. Jones drove defendant to the bus station in Placerville about one hour later. Defendant wanted to visit friends.

Kevin had been interviewed several times prior to the trial. On the evening of July 9, 1981, he first told Placerville Police Officer Southern that when he arose at 10 a.m. on July 8 both defendant and the family car were gone. He later said that on that morning he, defendant, and their mother had left the house together at 8 a.m. to drive to Placerville, where they cashed a check and bought the money order, returning home just after 10

---

[6]The parties stipulated "that Kevin Jones has an existing physical or mental illness within the meaning of California Penal [*sic*] Code Section 240(a)(3) and is unable to attend or testify at the trial . . ."

Evidence Code section 240, subdivision (a)(3), provides that a witness is "unavailable" if he is: "Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity."

a.m. On July 10, 1981, Kevin told Southern he had lied previously, and that defendant had been gone when Kevin arose at 10 a.m. on July 8, but had arrived at the house shortly after 10 a.m. On this occasion he said that defendant had a moustache on the morning of July 8, but shaved it off on the following morning, telling Kevin to tell anyone who asked that he had shaved it off a week earlier. On July 13, Kevin repeated that defendant had a moustache on July 8, but had shaved it off on July 9.

Defendant was apprehended on July 15, 1981, in Windsor (Sonoma County), after one of two women and a baby he had kidnapped attempted to escape from her van, attracting the attention of a gas station employee who came to help. Defendant fled on foot, and was located by police who found him hiding nearby. These kidnap victims, Debora Coffler, Patricia Dobbs, and Dobbs's five-month-old son, had been at a park in Fairfax, where the women played tennis. As they returned to their van, defendant ran up, and ordered the women, at knifepoint, into the back of the van. He told them he was wanted for murder, that he would be shot on sight by the police, and had nothing to lose since he was a murderer who would go to the gas chamber. He refused Dobbs's offer of money and the keys, saying that if he let the women go, the police would be after him in seconds. He repeated the statement that he was a murderer and would not hesitate to hurt them at that time and again during the northward journey.

B. *Guilt Phase Evidence: The Defense Case.*

Defendant testified that he had been living at the ranch for about five months in July 1981. The family car was a 1975 Chevrolet Impala, which was silver with a black naugahyde top. He was cultivating marijuana for profit and had about 100 plants at that time. When he visited Peggy Steuben on the July 4, 1981, weekend he had a full beard, and his hair was two or three inches below his collar. When speaking of why someone might kill a witness to a crime he was never speaking about himself. On the Monday following that weekend visit he had cut off his beard, but left sideburns to the bottom of his ear and a moustache just past the corners of his mouth.

Defendant testified that on July 8, 1981, he arose at 7:30 a.m., shaved, and drove alone to Placerville where he cashed his unemployment check at the supermarket, and purchased a money order for $150 which he mailed to his landlord.[7] He returned home by 10:15 a.m., and remained until 1:30

---

[7] It was stipulated that the landlord, James Marden, would testify that he deposited a postal money order in the amount of $150 in his bank account on July 13, 1981. He did not recall the date of receipt. Officer Southern would testify that he received the envelope in the mail from James Marden on July 23. It bore defendant's return address and was postmarked July 8, 1981.

p.m. when he and his brother Kevin drove to Georgetown, where they purchased beer. They then went to Georgetown Springs, where they drank the beer. They returned to their house about 3:30 p.m., and might have been driving fast. Kevin left the house, driving the family car about 6:30 p.m. When he heard a vehicle on the property later that evening defendant went outside and saw two cars, one of them a patrol car. The other, a brown Camaro, stopped first next to the patrol car, and then drove up the driveway, shining its spotlight on buildings below the house. It then proceeded to the house.[8] The driver ignored defendant's mother who asked what he wanted, and drove back to the patrol car. When Kevin returned shortly thereafter, defendant left the house in the trunk of the car because he assumed these cars were there because of the marijuana. He was on parole. He told Kevin to tell Dana he was dealing cocaine because he might be ripped off if anyone knew he was growing marijuana.[9]

On July 9, defendant went back to the family house. No police were there, but defendant decided to go visit some friends until he could find out what was happening. He walked from the bus station to an on-ramp to Highway 50, and from there hitched a ride to Ms. Steuben's house in Rancho Cordova. He had sideburns, a moustache, and hair below his collar at that time. That afternoon he walked to the American River, stopping en route to telephone his own home and learned from Kevin that the police were there looking for him. He returned to the Steuben home where he shaved off his moustache, trimmed his sideburns, and cut two inches off his hair. He then went back to the American River where he found a place to sleep and remained for five days. When he saw an article in the newspaper

---

A postal employee would testify that she sold a $150 money order on July 8, 1981. It was the first money order sold on that date.

An investigator would testify that, based on his experiments, driving from the Placerville Post Office to the location of the welfare department took between two and three minutes.

[8] Other evidence established that this car was driven by a deputy sheriff in the detective division who drove up the driveway toward the residence on the evening of July 8, 1981, saw no vehicles other than a red Firebird, and as he was leaving had to back up to permit the car driven by Kevin to pass. It was then completely dark and both cars had their headlights on. The car driven by Kevin appeared to be green in that light.

[9] When asked on cross-examination if he had considered simply removing the marijuana, instead of himself, defendant explained that the plants would not fit in the car, and he hated to destroy a valuable crop on the chance that he might be arrested. He also felt that because his mother and brother had no prior criminal record, they would likely receive probation or a light sentence if they were found to be cultivating the marijuana, whereas he thought he faced a minimum of seven and one-half years' imprisonment since he was on parole.

Even though defendant had an agreement with Marden who was to assume sole responsibility for the crop if it was discovered, defendant believed that his parole agent would exercise his discretion to charge a violation of parole, and defendant would have to serve six months. He was willing to expose himself to possible conviction for the abductions in Marin rather than face the possible seven and one-half years he believed he faced if he was convicted for cultivating the marijuana.

on July 14 saying he was being sought for a murder, he was scared. He hitchhiked to San Anselmo, spent a night near a creek there, and then committed the kidnapping described by Ms. Dobbs. He did not recall saying he was a murderer, but acknowledged that he told the women he was wanted for murder. He did so to scare them into doing what he wanted. He denied committing the murder of Ms. Pennington or rape of Ms. D.

Defendant weighed about 190 pounds at the time of trial. He testified that he had weighed 195 to 200 pounds in July 1981. At trial he had a full beard because it was difficult to obtain a razor in jail, and he liked having a beard.

The remainder of the defense case was directed primarily to attempts to discredit the identification testimony by pointing out inconsistencies in Ms. D.'s statements, and dangers inherent in eyewitness identification. Dr. Loftus, a psychologist, testified regarding the effects of stress on human memory, about "photo biased identification," and the likelihood that a person who was confident in making an identification was wrong. The officers to whom Ms. D. had described her assailant testified regarding her statement that he was Mexican or possibly Mexican, her description of the car, and her recall of defendant's moustache, beard, and hair. A member of the El Dorado district attorney's staff recalled that Ms. Steuben had told him that defendant had been clean shaven when she saw him on the day after the events in question. Evidence was also offered that in each month a pharmacy in Placerville sold six to twelve cool cushions of the same brand as that seized in defendant's car.

C. *Penalty Phase Evidence.*

The prosecution presented evidence that defendant and a second man had abducted, raped, and robbed Kerry A. in Long Beach in 1971, and defendant had abducted and raped 17-year-old Deborah B. in 1975. Ms. M., a friend, who was one of two women with Kerry A., testified that they had stopped at a gas station at 12:30 a.m. on February 12, 1971, and while she waited for the other two women to return from the restroom, defendant entered the car from the passenger side, knife in hand, ordering her to do what he said. He allowed the other two women to return, and then drove to an industrial area where she was ordered to park at the end of a cul-de-sac against a chain link fence in the driveway of a commercial building. The second man pulled in and parked his car behind them. Defendant ordered Kerry A. out of the car. The second man got into the car with Ms. M. and the third woman, while defendant raped Kerry A. in the other car. They then returned to Ms. M.'s car. Defendant spoke with his companion, after which he ordered Kerry A. to return to the other car with his companion. She did so and was raped again by that man. Defendant took all of their

money and car keys. Defendant was apprehended and convicted of forcible rape in this incident.

Deborah B. testified that defendant stopped a truck next to her as she walked to her boyfriend's house in San Jose about 5 p.m. on November 11, 1975, and offered her a ride. After she got in, defendant indicated he was going to a different location, and when she asked to get off, defendant grabbed her head, pushed her down, and told her he would cut her throat if she moved. She felt something like a knife against her neck. Defendant handcuffed her, and drove to the Guadalupe Dam area where he grabbed her, led her down a dirt path and across a creek, and ordered her to lie down on the dirt. After removing the handcuffs, defendant raped her. Defendant was convicted of forcible rape in this incident also.

Ms. Dobbs testified that during the abduction on July 15, 1981, defendant asked her whether the back seat of her van pulled out into a bed, to which she falsely replied that it did not. He moved into the rear of the van while she drove, and ordered Ms. Coffler to take off her clothes. He held a knife as he ordered her to stop begging. Ms. Dobbs then said she could not drive safely if nervous and asked defendant to return to the front seat. He then ordered her to drive and asked if she wanted him to rape her instead of Ms. Coffler. He finally returned to the front seat, and when reminded that he had promised not to hurt the women if they cooperated, said that he had meant not breaking bones or killing them, but rape they could live with. Ms. Dobbs also testified that during her attempted escape from the van, defendant grabbed her hair and flung her to the floor. When she struggled with him as he tried to start the van he stated that he was going to kill her then. She managed to throw his knife, which he had dropped, out of the window and to escape herself.

The occupant of the mobilehome to which defendant ran from the gas station, testified that when she opened her door to see who was there, defendant put a knife to her stomach and demanded her car keys.

The director of the handicraft program at the California Medical Facility testified that defendant's participation and work in the program was above average. He identified ribbons awarded to defendant by outside judges for his work, and said that defendant had done woodwork, ceramics, and jewelry. Another employee described defendant's work as excellent, identifying a wooden chess set and wooden clock made by defendant. He had heard defendant play the guitar well.

An instructor at Soledad College had awarded defendant an A in a geography class he taught at Vacaville, stating on the report card that

defendant had the best mind in the class and could easily do university level work.

It was stipulated that defendant's seventh-grade teacher would testify that defendant was a bright and sensitive child, who came to school early, and appeared to be healthy. The owner of a crafts shop in Placerville testified that defendant brought in some excellent craft items that he had made in early 1981 and they sold very well.

Defendant's mother testified that she still loved defendant. She was divorced from defendant's father when he was only two; his father only visited defendant for another year or two and then did not see defendant until he was sixteen. Defendant's mother remarried, but was divorced again after four years. Defendant saved Kevin from drowning in the ocean when Kevin was five or six years old. Defendant's aunt testified that defendant often went camping, fishing, and motorcycle riding with her former husband, and became upset when the husband was killed in a truck crash.

## II

### GUILT PHASE ISSUES

Defendant claims first that his attorneys rendered constitutionally inadequate assistance at both the guilt and penalty phases of his trial. Because the record on appeal does not support this contention, and it is also the basis for defendant's petition for writ of habeas corpus, this claim will be discussed separately below when that petition is considered.

Defendant makes only two other assertions of error with respect to the guilt phase of his trial. ██ ██ He contends that the trial court erroneously denied his motion to quash the jury panel, a motion based on his claim that the exclusion of ex-felons and resident aliens from juries in this state denies defendants a representative jury. He also claims that the court erred in admitting, over his objection, the testimony of Peggy Steuben that he had stated he might kill a victim-witness to avoid being returned to prison. We reject both.

### A. *Jury Selection.*

██ Defendant acknowledges that his claim that a jury which excludes ex-felons and resident aliens cannot be representative of a fair cross-section of the community as required by the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution, is an invitation to the court to reconsider its rejection of the claim in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595]. He cites no intervening or additional authority, suggesting only that we adopt

the reasoning of the concurring opinion of former Chief Justice Bird in *People* v. *Coleman* (1985) 38 Cal.3d 69, 95-98 [211 Cal.Rptr. 102, 695 P.2d 189].

Defendant correctly notes that *Rubio* v. *Superior Court, supra,* 24 Cal.3d 93, is not binding precedent since a majority of the court did not join in the plurality opinion which concluded that neither category of excluded persons constituted a "cognizable group." That opinion reasoned that while the petitioner had satisfied the requirement that he show that members of the excluded group share a common perspective arising from their experience as a member of the group, he had not established that no other jury-eligible members of the community could adequately represent the viewpoints of ex-felons and resident aliens.

The plurality opinion did not address a claim that Code of Civil Procedure sections 198 and 199 violate the fair cross-section requirements of the state and federal Constitutions in excluding resident aliens.[10]

The concurring opinion in *People* v. *Coleman, supra,* 38 Cal.3d 69, 95-98, disputed the premise of *Rubio, supra,* 24 Cal.3d 93, that naturalized citizens adequately represent the perspective of resident aliens, reasoning that because resident aliens constitute a significant proportion of the community, relegating them to "vicarious" representation by naturalized citizens violated the cross-section requirement.

Defendant offers no authority for a conclusion that the drafters of the Sixth Amendment, or the drafters of the California Declaration of Rights, of which article I, section 16 is a part, contemplated the seating of either convicted felons or noncitizens on petit juries. Furthermore, although both convicted felons and noncitizens were resident in the United States and in the State of California when those provisions were adopted, he offers no evidence that their numbers have now grown so large in proportion to jury-eligible citizens as to constitute a change in circumstances that warrants disregarding that intent in construing those constitutional provisions.

To the extent that evidence of the drafters' intent is available, it suggests that article I, section 16 does not contemplate inclusion of either ex-felons

---

[10] Code of Civil Procedure section 198: "(a) Except as provided in subdivision (b), a person is competent to act as a juror if he or she is all of the following:

"(1) A citizen of the United States of the age of 18 years who meets the residency requirements of electors of this state.

". . . . . . . . . . . . . . . . . ."

Code of Civil Procedure section 199: "A person is not competent to act as a trial juror if any of the following apply:

". . . . . . . . . . . . . . . . . .

"(b) The person has been convicted of malfeasance in office or any felony or other high crime.

". . . . . . . . . . . . . . . . . ."

or resident aliens on juries. Section 198 of the Code of Civil Procedure, enacted in 1872, was in effect at the time the Constitution of 1879 was drafted and adopted. It provided then, as it does now, that a person is competent to act as a juror if, inter alia, he is "a citizen of the United States. . . ." We find no indication in the debates during the constitutional convention of 1878 that the drafters contemplated expansion of jury eligibility to include noncitizens.

Article XX, section 11 of the 1879 Constitution, and article XI, section 18 of the 1849 Constitution, each provided that laws were to be enacted "to exclude from office, serving on juries, and from the right of suffrage, those who shall hereafter be convicted of bribery, perjury, forgery, or other high crimes. . . ."[11] That statutory prohibition, originally enacted in 1851, excluded both noncitizens and ex-felons from juries, providing: "1. A person shall not be competent to act as a Juror, unless he be:

"1st. A Citizen of the United States.

". . . . . . . . . . . . . . . . . . . .

"5th. Nor shall any person be competent to act as a Juror, who has been convicted of a felony or a misdemeanor, involving moral turpitude." (Stats. 1851, ch. 30, § 1, p. 290. See also, Stats. 1863, ch. 405, § 1, p. 630; Stats. 1864, ch. 406, § 1, p. 462.)

Since neither noncitizens nor ex-felons were competent to act as jurors when the Constitution of 1879 was enacted, we cannot conclude that the right to jury trial, and to a fair and impartial jury drawn from a representative cross-section of the community (see *People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]) contemplated inclusion of either category of persons in that "representative cross-section" of the populace. Defendant's claim, therefore, must find its support in decisions under the Sixth Amendment to the United States Constitution. To date, the United States Supreme Court has not concluded that a jury panel which excludes noncitizens and ex-felons is not sufficiently representative of the community to satisfy the Sixth Amendment guaranty of an impartial jury. (See *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664];

---

[11] Section 11 of article XX, was repealed as part of the miscellaneous constitutional revisions constituting Proposition 14 at the June 8, 1976, Primary Election. The analysis of the Legislative Analyst, after explaining that the proposition would reorganize parts of the Constitution, stated: "The meaning of the Constitution will not be affected by either the passage or the rejection of this proposition." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 8, 1976) p. 58.)

It appears therefore that no change was intended in the construction to be accorded article I, section 16.

*Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]; *Smith* v. *Texas* (1940) 311 U.S. 128, 130 [85 L.Ed. 84, 86, 61 S.Ct. 164].)

### B. *Evidence of Defendant's Statements to Steuben.*

■■■ Defendant moved, *in limine,* to exclude as hearsay evidence of his July 5, 1981, statement or statements to Peggy Steuben that he would not hesitate to eliminate witnesses if he committed a crime. He did so on grounds that the statement did not reflect intent to commit a crime, and thus was not admissible under the exception to the hearsay rule created by Evidence Code section 1250;[12] the statement was not shown to be made under circumstances showing trustworthiness and thus should be excluded under Evidence Code section 1252,[13] and because the probative value of the evidence was outweighed by its prejudicial effect.[14] The court ruled that the evidence would be admitted under the hearsay exception for admissions by a party.[15] The court also reasoned that the statement was circumstantial evidence of defendant's state of mind showing his design and plan to kill the victim if he committed a crime, and that in turn would be circumstantial evidence that he acted in accordance with that plan, but the court did not admit the statement on that basis. ■■ ■■ ■■ ■■ Finally, while recognizing the prejudicial impact of the statement, the court ruled that the statement, being made only three days before the crime, was so highly probative that its value outweighed the potential prejudice.[16]

---

[12] Evidence Code section 1250: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

[13] Evidence Code section 1252: "Evidence of a statement is inadmissible under this article [as an exception to the hearsay rule for statements of mental or physical state] if the statement was made under circumstances such as to indicate its lack of trustworthiness."

[14] Evidence Code section 352: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[15] Evidence Code section 1220: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

[16] Defendant did not object to Ms. Steuben's testimony when it was actually offered. Since a ruling on a motion *in limine* is not generally binding on the trial court, which is free to reconsider its ruling at the time the challenged evidence is offered, the failure to object normally constitutes a waiver. (See *People* v. *Campa* (1984) 36 Cal.3d 870, 885-886 [206 Cal.Rptr. 114, 686 P.2d 634]; *People* v. *Superior Court (Zolnay)* 15 Cal.3d 729, 734 [125 Cal.Rptr. 798,

■ Defendant now claims that because there was no evidence that the threat to kill witnesses related to a specific, intended crime the evidence was not relevant. He made no objection at trial on relevancy grounds, however, and is precluded from so doing now except to the extent that this factor affects either the applicability of a hearsay objection or an assessment of the propriety of the trial court's exercise of discretion to admit the evidence as more probative than prejudicial. Defendant claims, in this regard, that the statement cannot be an admission because an admission is an "acknowledgment of a fact."

The People, not responding directly to the relevance argument, contend that the evidence was admissible both as an admission under Evidence Code section 1220, and as evidence of defendant's state of mind under subdivision (a)(2) of Evidence Code section 1250. They also argue that the trial court properly exercised its discretion under Evidence Code section 352 in ruling that the evidence was admissible. The ruling must be upheld if the evidence was admissible under any hearsay exception. Therefore, although there may be merit in defendant's argument that a threat made prior to a crime may not be considered an "admission" unless a specific crime is contemplated and intended, we need not reach this question if the statement is admissible under section 1250 of the Evidence Code.

1. *Evidence Code Section 1250: Statements of Intent.*

■ We reject at the outset defendant's claim that his statement to Ms. Steuben should have been excluded under Evidence Code section 1252, on grounds that there was no showing that it was made in circumstances such as to indicate that it was trustworthy. Section 1252 requires exclusion only if the circumstances are such as to suggest that a statement is *not* trustworthy. Nothing in the record suggests that defendant's statement, made during a conversation with a friend whom he often visited, in the home of the friend on the occasion of a purely social visit, was not trustworthy. He was not under any compulsion to speak. The circumstances were not such that he would have any motive to lie, or to exaggerate the extent of his aversion to prison life. There is no suggestion that the statement was "made with a motive to misrepresent or to manufacture evidence." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1252, at p. 283; Deering's Ann. Evid. Code (1986 ed.) § 1252, pp. 419-420.)

---

542 P.2d 1390]; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257, 266 [61 Cal.Rptr. 510].)

In this case, however, the motion was made and heard during trial on the day the evidence was offered. The court was thus in a position to assess the relevance of the evidence, whether because of that relevance it fell within a hearsay objection, and whether its probative value outweighed its prejudicial impact. It is evident from the record that the court and the parties treated the motion to exclude the evidence as the equivalent to an objection. The People do not contend that the issue is not properly before this court.

 We next consider, therefore, whether defendant's statements were admissible as evidence of his state of mind at the time the statements were made. Again, we must recognize that defendant's statements related to a hypothetical situation. There is no suggestion in the record that at the time defendant made his statements to Ms. Steuben he contemplated committing a criminal offense, or in particular the rape of Ms. D. We must also recognize that evidence that defendant so feared his return to prison that he contemplated killing a witness or witnesses if he committed any future crimes was relevant to several issues in the case. As evidence of motive, it could be circumstantial evidence of identity. It could also be circumstantial evidence that when he shot Ms. Pennington and Ms. D., he intended to kill, harbored malice, and killed Ms. Pennington with deliberation and premeditation.[17]

Evidence that a person has a propensity to commit criminal acts is inadmissible, however (Evid. Code, § 1101), and is excluded because of its highly prejudicial nature. It is for this reason that evidence of uncharged crimes is generally inadmissible and may not be admitted if its only relevance is to show that the defendant had a propensity to commit a crime, a propensity that is circumstantial evidence that he committed the charged offense. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 316 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Schader* (1969) 71 Cal.2d 761, 772-773 [80 Cal.Rptr. 1, 457 P.2d 841].) Evidence of a defendant's statement regarding possible future criminal conduct in a hypothetical situation has at least as great a potential for prejudice in suggesting a propensity to commit crime as evidence of other crimes. Therefore, the content of and circumstances in which such statements are made must be carefully examined both in determining whether the statements fall within the state-of-mind exception, as circumstantial evidence that defendant acted in accordance with his stated intent, and in assessing whether the probative value of the evidence outweighs that potential prejudicial effect.

Although once again the specific hearsay exception under which the evidence was admitted was not an issue in the case, *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 757 [230 Cal.Rptr. 667, 726 P.2d 113] is instructive with regard to the admissibility of "generic" threats. We stated there: "A defendant's threat against the victim . . . is relevant to prove intent in a

---

[17] Jefferson explains the relevance of a declarant's statement of intent: "A statement of a declarant's intention to do certain acts or engage in certain conduct is admissible to prove that he did those acts or did engage in that conduct. This is an example of both direct and circumstantial evidence. Declarant's statement of his intention is direct evidence of the fact of his state of mind. The fact of his state of mind—to wit, his intention—becomes proof that declarant acted or conducted himself in accordance with his intention as an element of his state of mind. It is an accepted principle of circumstantial evidence that a person's conduct or acts may be inferred from proof of that person's state of mind." (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 14.1, p. 384.)

prosecution for murder. (*People* v. *Lew* (1968) 68 Cal.2d 774, 778 [69 Cal.Rptr. 102, 441 P.2d 942].) The statements here in question did not specify a victim or victims but were aimed at any police officer who would attempt to arrest appellant. Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat. [Citations.] Hence the statements were relevant and not excludable under Evidence Code section 1101."

The same reasoning leads to a conclusion that statements of intent of this nature, reflecting intent to kill a particular category of victims in specific circumstances, fall within the state-of-mind exception to the hearsay rule. (Evid. Code, § 1250.) The evidence is therefore admissible unless the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind was transitory and no longer existed at the time of the charged offense.

### 2. *Evidence Code Section 352: Probative Value.*

■ Defendant argues that even if the evidence was otherwise admissible as an exception to the hearsay rule, the trial court abused its discretion in admitting the evidence. He contends that any probative value of the evidence was minimal, while its "undue prejudice was massive."

■ The trial court is vested with wide discretion in determining the admissibility of evidence. Its exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a clear abuse, i.e., unless the prejudicial effect of the evidence clearly outweighs its probative value. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1255-1256 [232 Cal.Rptr. 849, 729 P.2d 115].) Moreover, the record must affirmatively show that the trial court did in fact weigh the prejudicial effect of the evidence against its probative value. (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) ■ That requirement is met here and we find no abuse of discretion in the admission of this evidence.

The record confirms that the court gave careful consideration to this question before admitting Ms. Steuben's testimony. In the view of the trial court, the fact that the statement was made only three days before the commission of the crime enhanced its probative value, and because at the time of the ruling the identity of the perpetrator appeared to be the principal issue, the court concluded that as a statement of motive, plan, and design the probative value of the statement was great. The court therefore concluded that the highly probative nature of the evidence substantially outweighed the danger of undue prejudice from its admission.

As we have noted in the discussion above, defendant's statement regarding his intent, while not directed toward a specific victim, did contemplate

the action he would take in circumstances much like those which preceded the murder of Ms. Pennington and attempted murder of Ms. D. When Ms. Steuben suggested that the crime of rape was a horrible thing and asked defendant why he would kill the victim, he replied that leaving a witness to testify would send him back to prison. Shortly thereafter a rape was committed and the perpetrator attempted to kill both the victim and a witness, even though they had been taken to a remote area and the perpetrator had tied them up and had at hand both transportation to escape and the ability to radically change his appearance. The brutal, senseless, and apparently unnecessary homicidal conduct of the rapist/kidnapper fortunately is not common to most rapes. Under the circumstances we agree with the trial court that the probative value of the evidence was great. The highly prejudicial nature of the evidence lay not in the fact that the jury might consider it as reflecting a propensity on defendant's part to commit murder, but in its value in identifying defendant as the perpetrator of the crimes and demonstrating his motive and mental state.

The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. ■ "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" (*People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859].)

## III

### PENALTY PHASE ERROR

#### A. *Testimony of Defendant's Prior Rape Victims.*

At the outset of the penalty phase of the trial, defendant offered to stipulate that he had been convicted of the rape of Kerry A. in 1971 and that of Deborah B. in 1975. He proposed to stipulate that the 1971 offense was committed with force and violence, to the "factual basis surrounding" that rape," and to the statements given to police officers by the witnesses to that offense. A similar offer was made with regard to the 1975 offense. The court first indicated a willingness to grant the motion over the objection of the People, and directed counsel for defendant to put the stipulation in writing and to include every allegation made by the witnesses. Before that was done, however, the court denied the motion, ruling that the People

could not be forced to stipulate, and that the People had the right to put the evidence before the jury.

 Defendant contends that this ruling was error, relying on this court's decision in *People v. Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826]. *Hall* is not dispositive, however. In that case the defendant, an ex-felon, was charged with robbery and with violating section 12021, which prohibits possession of a concealable firearm by an ex-felon. He offered to stipulate to his status as an ex-felon, an element of the offense, and thereby preclude introduction of evidence of his prior conviction. The trial court refused to permit the stipulation, and evidence of a prior conviction for robbery was introduced. We held that this was error: "[I]f a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence of other crimes to prove that element to the jury." (28 Cal.3d 143, 152.)

We were careful to note, however, that this rule of exclusion was not applicable "[i]f the facts to which the defendant has offered to stipulate retain some probative value . . . . For example, if evidence remains relevant to an issue not covered by the stipulation or admission, the evidence is admissible on the remaining issue. [Citations.] If the stipulation would force the prosecution to elect between theories of guilt, or would hamper a coherent presentation of the evidence on the remaining issues, evidence of the stipulated facts is admissible. [Citation.] Further, if a stipulation or admission is 'ambiguous in form or limited in scope or [if] during the trial of a case, a party seeks to deprive his opponent of the legitimate force and effect of material evidence . . . ,' the evidence retains some probative value and is admissible." (*People v. Hall, supra,* 28 Cal.3d 143, 152-153.)[18]

The purpose of introducing evidence of prior convictions as aggravating factors at the penalty phase of a capital case is not comparable to proving ex-felon status an element of a criminal offense. A penalty phase jury is not simply making factual findings leading to a determination of guilt. In weighing the appropriate penalty, deciding between death and life imprisonment without possibility of parole, the jury performs a normative function, applying the values of the community to the decision after considering the circumstances of the offense and the character and record of the defendant. (*People v. Brown, ante,* p. 432, 448 [205 Cal.Rptr. 604, 1135 P.2d 758];

[18]Subsequent to *People v. Hall, supra,* 28 Cal.3d 143, section 28 was added to article I of the California Constitution. Subdivision (f) of section 28 provides, inter alia: "When a prior felony conviction is an element of any felony offense, it shall be proved to the trier of fact in open court." Although this provision abrogates the broad holding of *Hall,* it does not mandate admission of evidence of the "nature" of the prior conviction. (*People v. Valentine* (1986) 42 Cal.3d 170, 181-182 [228 Cal.Rptr. 25, 720 P.2d 913].) Neither section 28, subdivision (f), nor *Valentine* otherwise affects our conclusion in *Hall* that if relevant to some other issue in the case the prior conviction, and thus its nature, may be proven.

*People* v. *Brown* (1985) 40 Cal.3d 512, 540 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

The evidence which the People sought to introduce was not only the fact of defendant's prior convictions or the nature of the offenses, evidence that may come under section 190.3, factor (c), but also the fact that these offenses were violent assaultive crimes. In enacting factor (b) of section 190.3, the electorate intended to allow admission of evidence of violent criminal acts, not simply the fact of prior felony convictions. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480].) Reading to the penalty phase jury the victims' and witnesses' descriptions of a crime is not an adequate substitute for testimony during which the prosecutor may elicit the details he believes to be particularly relevant to the penalty decision. As we have noted in *People* v. *Brown, supra, ante,* at page 445, "the People may properly present evidence showing the circumstances of the prior violent criminal activity." They are not required to accept defendant's stipulated limitation of the facts or the manner in which they are presented.

We find no merit in defendant's claim that proving the commission of a capital defendant's prior assaultive conduct through the testimony of the victim violates *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. There the United States Supreme Court held that a "victim impact statement" could not be presented to the sentencing authority. The reasoning underlying that decision was that the impact of the capital offense on the family of the victim was not relevant to any issue the jury was called upon to decide in selecting the appropriate penalty. The focus of the victim impact statement was "not on the defendant, but on the character and reputation of the victim and the effect on his family" (*id.* at p. 504 [96 L.Ed.2d at p. 449]), factors that might be irrelevant to the culpability of the defendant. For this reason, and because the extent to which the victim's family was able to express grief over the death of the victim also was irrelevant to culpability of the defendant, the court concluded that the victim impact statement would divert the jury from its focus on the defendant "as a uniquely individual human being" as required in capital sentencing, and thus would violate the Eighth Amendment. "The admission of these emotionally-charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." (*Id.* at pp. 508-509 [96 L.Ed.2d at p. 452].)

The evidence introduced here was not evidence of the impact of defendant's capital offense on the family of the murder victim, and is not compara-

ble to the victim impact statement at issue in *Booth*. Nothing in *Booth* suggests to us that the court intended to preclude presentation of live testimony by the actual victim of a capital defendant's prior crimes to prove those crimes simply because the impact of the crime on the victim might be apparent to the jury. To the contrary, we believe that the impact of a capital defendant's crimes on the victims of those crimes is relevant to the penalty decision.[19]

The court did not err in rejecting defendant's offer to stipulate.

B. *Prejudicial Impact of Evidence of Attempted Rape of Debra Coffler.*

Defendant next contends that the trial court erred in failing to weigh the prejudicial impact against the probative value of the evidence of his attempt to rape Ms. Coffler during the Marin-Sonoma County abduction, and in denying his motion to exclude that evidence.[20]

The short answer to this claim is that the evidence is expressly made admissible by factor (b) of section 190.3. The court is not given discretion under Evidence Code section 352, to exclude this evidence when offered at the penalty phase where, as discussed above, the question for the jury is not one of fact in determining guilt.[21]

---

[19] Indeed the high court appears to have itself distinguished the impact of a capital offense on the family of the murder victim from the impact on a direct victim of a crime in finding the former irrelevant. The court cited with approval this statement of the Court of Appeal in *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 516-517 [203 Cal.Rptr. 276]:

" 'We think it obvious that a defendant's level of culpability depends not on fortuitous circumstances such as the composition of his victim's family, but on circumstances over which he has control. A defendant may choose, or decline, to premeditate, to act callously, to attack a vulnerable victim, to commit a crime while on probation, or to amass a record of offenses. . . . In contrast, the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of a homicide in the first place. Such bereavement is relevant to damages in a civil action, but it has no relationship to the proper purposes of sentencing in a criminal case.' " (482 U.S. at pp. 504-505, fn. 7 [96 L.Ed.2d at pp. 449-450].)

[20] Although defendant moved for exclusion of the evidence under Evidence Code section 352, his argument to the court was based on a construction of subdivision (b) of section 190.3 that would limit evidence of violent criminal activity to conduct prior to the murder for which the defendant was on trial. The court properly rejected that argument, noting that nothing in the language of section 190.3, factor (b), supported that theory.

That factor provides that the trier of fact shall take into account "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant suggested that postoffense conduct was not relevant to his culpability at the time he murdered Ms. Pennington. It is relevant, however, to his character. Consideration of this evidence is expressly permitted by statute and defendant suggests no constitutional barrier to that consideration.

[21] We do not mean to suggest that evidence may not be excluded under Evidence Code section 352, at the penalty phase. The manner in which the prosecution seeks to present its case may give rise to meritorious objections to particular items of evidence. We hold here only

## C. *Jury Misconduct.*

 Defendant next contends that the trial court erred in denying his motion for new trial, a motion based on assertedly prejudicial juror misconduct. That misconduct consisted in one juror consulting a dictionary for a definition of "mitigating," and in another juror asking a librarian if the public library had any of the books authored by Dr. Loftus, defendant's expert who had testified at the guilt phase about eyewitness identification. The first juror related the dictionary definitions to the jury. The second told some that the public library had none of the books authored by Dr. Loftus.

The rules governing jury misconduct are clear. "Jury misconduct raises a presumption of prejudice, and 'unless the prosecution rebuts that presumption . . ., the defendant is entitled to a new trial.' [Citations.] The presumption of prejudice 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. . . .' [Citation.] Whether a defendant has been prejudiced by a juror's outside communications depends upon 'whether the jury's impartiality has been adversely affected, and whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted.' [Citations.]" (*People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].)

 The People did not dispute the claim that misconduct occurred below. They now argue that use of a dictionary is not necessarily misconduct, suggesting that this is permissible when the purpose is to validate the jurors' understanding of commonly used words. This argument confuses the question of whether misconduct occurred with the question of whether the jury's resort to the dictionary might be prejudicial. Resort to outside sources for amplification of instructions is not permitted.[22] Jurors are not allowed to obtain information from outside sources either as to factual matters or for guidance on the law. (*In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207-209 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 157 [141 Cal.Rptr. 698, 570 P.2d 1050].) Use of a dictionary to obtain further understanding of the court's instructions poses a risk that the jury will misunderstand the meaning of terms which have a technical or unique usage in the law.

---

that the court does not have discretion to prevent introduction at the penalty phase of all evidence of a capital defendant's commission or attempted commission of a prior violent felony.

[22] In *People* v. *Billings* (1981) 124 Cal.App.3d 422 [177 Cal.Rptr. 392], on which the People rely, the parties agreed that a dictionary might be sent into the jury room when requested by the foreman. The Court of Appeal held that the parties' agreement waived any error, but also concluded that the use of the dictionary was not misconduct. To the extent that this conclusion is inconsistent with that reached here, *Billings* is disapproved.

Defendant's motion was based on a declaration by one juror that, "to the best of his recollection," a juror stated during deliberations of "the guilt-innocent phase" that he had been unable to locate any books by Dr. Loftus at the library, and that during the same deliberations "we had difficulty with definitions of some of the words and one of the female jurors looked these words up advising us later of what her dictionary's definitions of these words were." The People, however, offered declarations by several jurors which established that the misconduct occurred during the penalty phase of the trial, and the initial juror executed a second declaration stating that if the word "mitigating" had been included in a penalty phase instruction it was during that phase of the trial that the definition was given.

The remaining declarations offered by the People in opposition to the motion for new trial were adequate to rebut the presumption of prejudice and to satisfy this court that the trial court did not err in denying the motion. Juror H. declared that it had been his custom to go to the public library during the jury's lunch break. On one such occasion during the penalty phase while he was checking out books he asked whether the librarian had any books by Dr. Loftus, was told that the library did not, and he later mentioned "in passing," in the jury room that he had asked for books by Dr. Loftus and the librarian reported that she had none. The remark was a casual remark, and the juror did not state that the failure of the library to have such books had any bearing on the credibility or professional credits of Dr. Loftus.

The jury foreman was unsure of the phase of the trial during which this occurred but declared that it happened on the same day that another juror provided the jury with a dictionary definition of "mitigating." The juror who did so declared that she used Webster's New World, Second Collegiate Edition Dictionary to obtain the definitions of words in the court's instructions that were not specifically defined therein. Seven jurors declared that this juror had given a commonsense definition of "mitigating," and several of these jurors included mention that the definition indicated that it was the opposite of "aggravating."

Some of the jurors had not heard the remark about Dr. Loftus. Others declared that it had not been made during deliberations, and those who heard it indicated that there had been no remarks or discussion relating the statement to the qualifications of Dr. Loftus.

We see no way in which the remarks about the availability of books authored by Dr. Loftus in the Sacramento Public Library, or a branch thereof,[23] could have prejudiced defendant. Her testimony was related to the

---

[23] Defendant asks the court to take judicial notice, pursuant to Evidence Code sections 452, subdivisions (g), (h), and 459, of the location of the Sacramento Public Library and branches.

issue of identification, an issue resolved at the guilt phase before the remark was made. Defendant acknowledged in argument at the penalty phase that the jury had already determined the question of guilt. The qualifications of Dr. Loftus were not disputed at the guilt phase and were not relevant to any issue at the penalty phase. Therefore, even assuming that a juror might attach significance to the fact that texts by a particular psychologist were not available in a public library, there is no indication of prejudice at the guilt phase of the trial.

We also find no basis for prejudice to defendant in the jury's consideration of the dictionary definition of mitigating. That definition stated: "*mitigate* ([pronunciation]) *vt., vi. - ga'ted, gat'ing* [etymology] to make or become milder, less severe, less rigorous, or less painful; moderate *miti-ga-ble* ([pronunciation]) adj. *miti-ga'tion. mit'i-ga'tive* adj. *mit'i-ga-tor* n. *mit'iga-to'ry* ([pronunciation]) adj." (Webster's New World Dict. (2d college ed. 1982) p. 911.) We assume therefore, as does defendant, that the definition considered by the jury was that mitigation means "to make mild, soft, or tender, and "to make or become milder, less severe, less rigorous, or less painful; moderate."

The word "mitigating" appeared several times in penalty phase instructions.[24] The verdict forms, which the court gave to the jury after first reading them, also used the term, requiring the jury to expressly find either that

The People oppose the request. In light of our conclusion that the presumption of prejudice to defendant from the juror's statement was rebutted by the record, we agree that this information has no consequence to the determination of the action (Evid. Code, §§ 455, 459, subd. (d)). The motion to take judicial notice is, therefore, denied.

[24] That instruction explained: "It is now your duty to determine which of the two penalties, death or confinement in State prison for life without possibility of parole shall be imposed upon the Defendant. After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose sentence of death; however, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State prison for life without possibility of parole.

". . . . . . . . . . . . . . . . .

"In considering taking into account being guided by [*sic*] the aggravating and mitigating circumstances, you may not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by their relative number, but rather by their relative convincing force on the ultimate question of punishment.

"If a factor is not found to be, by you, a mitigating factor, that, in and of itself, does not make that factor an aggravating factor, unless the Prosecution proves to you that the factor is an aggravating factor.

"If you determine that the aggravating factors do not outweigh the mitigating factors, or if you determine that they are equal, you must return a finding of life imprisonment without possibility of parole . . . ."

the mitgating factors outweighed the aggravating, or that the aggravating factors outweighed the mitigating.

While the dictionary definition of "mitigating" may not have been particularly helpful to the jury in understanding the use of the term in this context, defendant offers no persuasive argument to support a conclusion that the jury might have been misled. He suggests that if the jury had believed it could consider as mitigating evidence that did not pertain directly to the crime, notwithstanding the instruction, consideration of that definition would lead them to conclude that to be considered mitigating the factors had to make the crimes themselves "mild, soft, or tender," or "less severe, less rigorous, less painful, moderate."

Nothing in the definition suggests the restricted meaning that defendant believes the jury may have attributed to the word mitigating. For this reason, and because, as we discuss below, the court and counsel made it abundantly clear to the jury that all of the evidence defendant offered at the penalty phase was to be considered, the presumption of prejudice arising from this instance of misconduct is sufficiently rebutted. The trial court did not err in denying the motion for mistrial.

D. *Use of Former CALJIC No. 8.84.2.*

As noted above, the jury was instructed in the mandatory language of the 1978 death penalty statute that if it concluded "that the aggravating circumstances outweigh the mitigating circumstance *you shall impose a sentence of death.*" (Italics added.) We have heretofore acknowledged that this language could mislead a jury as to the "weighing process" by which it is to determine, in light of the relevant evidence, whether death or life without possibility of parole is the appropriate penalty, and as to the scope of its discretion in selecting the penalty. (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1277; *People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17.) For this reason we suggested that clarifying instructions, amplifying the statutory language, should be given. We have, however, declined to reverse penalty decisions unless, after review of not only the instructions, but also the argument of counsel, we conclude that the jury may have been misled in the particular case before us.

Defendant argues that the penalty should be reversed in his case because the instructions would lead the jury to conclude that it was to use a mechanistic process which left no choice as to the penalty. He contends that the potentially misleading impact of the unamplified instruction was exacerbated by other "errors" such as the failure of the court to delete reference to mitigating factors not present in his case, and in permitting the jury to consider nonstatutory aggravating factors, the omission of instructions

permitting the jury to consider as mitigating circumstances that did not extenuate the gravity of the crime, and the effect of the jury misconduct.

We disagree. The court did not err, of course, in reading to the jury all of the factors, both mitigating and aggravating, set forth in section 190.3, which the electorate considers particularly relevant to the penalty decision. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].) The jury is competent to determine which factors are relevant, and is thus better able to assess the particular defendant's culpability in light of the full range of statutory factors that might be present in a capital case.

It is also noteworthy that the court in this case avoided the "factor (k)" instruction, former CALJIC No. 8.84.1, which could suggest to a jury that the only mitigating evidence it should consider was that relevant to the crime itself.[25] Although the instruction given did refer to the gravity of the crime, the court twice expressly advised the jury that it was free to consider the sympathetic elements of defendant's background.[26] (Cf. *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813].) In addition, the jury was expressly instructed that at the penalty phase it could consider sympathy for the defendant.[27] And, although the court did use the mandatory "shall" in its instruction, this instruction was clarified by the preceding instruction in which the court fully explained the weighing process. "In considering taking into account being guided by the aggravating and mitigating circumstances, you may not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by their relative number, but rather by their relative convincing force on the ultimate question of punishment."

If these instructions did not adequately convey to the jury the scope of its sentencing discretion, the argument of counsel most certainly did. The prosecutor told the jurors that they would be looking at factors divided into two categories, those related to the crime itself, and those relating to the

---

[25] The court instructed: "You shall consider, take into account, and be guided by the following factors, if applicable: . . . K, any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, *including but not limited to the Defendant's character, background, history, mental condition, and physical condition.*" (Italics added.)

[26] Defendant contends in a separate argument that the instruction given by the court did preclude consideration of the evidence he offered in mitigation at the penalty phase. For the reasons discussed above we reject that claim. We note also that this instruction was given at the request of defendant.

[27] The court instructed: "In determining the question of penalty to be imposed upon the Defendant, you shall weigh the sympathetic elements of Defendant's background against those that may offend the conscience. In so doing, the jury may consider pity, sympathy, and mercy; however, you may not be governed by conjecture, prejudice, or public opinion."

defendant which suggested that "even though the circumstances of the crime might be such that punishment of death is appropriate, what is the background, what is there about this individual that would determine otherwise." In discussing the evidence, the prosecutor included defendant's penalty phase evidence with no suggestion that any was irrelevant because not related to the circumstances of the crime. To the contrary, the prosecutor stated with regard to the last ("k") factor: "Certainly you will take into consideration the last factor. It is at this point that you *must consider* [each of the items of mitigating evidence offered by defendant]." (Italics added.) The prosecutor used that phrase ("must consider") with regard to each of those items of evidence individually as he discussed its relevance.

The prosecutor's argument in this regard was echoed by defendant's counsel who asked for sympathy and mercy for defendant, and again emphasized that whether the mitigating factors were outweighed by aggravating was not determined by the relative number of factors, and the jury was not to simply count the factors.

We are satisfied that no legitimate basis exists for believing that the jury was misled by the instructions in this case as to the jury's discretion in selecting the appropriate penalty, or as to the nature of the weighing process and the evidence that it was to consider during that process. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 786-787.)

E. *Nonstatutory Aggravating Factors.*

■■■ Defendant argues that the penalty phase instructions permitted the jury to base its verdict on nonstatutory aggravating factors. He does not suggest that the instructions invited or permitted the jury to consider evidence other than that related to the statutory factors in aggravation and mitigation. Rather, his argument is that the jury was in fact permitted to consider nonstatutory aggravating factors because the court: (1) denied his requests to delete reference to inapplicable mitigating factors, and to instruct that the absence of a statutory mitigating factor did not constitute an aggravating factor; (2) instructed that if a factor was not found to be mitigating that did not itself make the factor an aggravating factor "unless the prosecution proves to you that the factor is an aggravating factor"; and (3) instructed the jury that it was to weigh the sympathetic elements of defendant's background against those "that might offend the conscience."

Again we disagree. As discussed above, reading the complete statutory list of mitigating and aggravating factors is proper. The advice to the jury that finding a factor was not mitigating did not by itself make that factor aggravating was also proper. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730,

788-789; *People* v. *Davenport* (1986) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861].) In *Davenport* we noted that section 190.3 does not designate any of the factors it enumerates as "aggravating" or "mitigating," and concluded that because some are particularly unlikely to be present in a given case, the prosecutor should not be permitted to argue that their absence was aggravating or those factors would automatically be present in most murders. (41 Cal.3d at p. 289.) In *Rodriguez* we held that age should not, of itself, be deemed an aggravating factor. (42 Cal.3d at p. 789.)

We have not, however, held that none of the statutory factors may be considered either aggravating or mitigating in the varying circumstances of capital cases. Had there been evidence which defendant sought to characterize as mitigating under one of the statutory factors, which the prosecutor argued should be considered aggravating in the particular circumstances of the defendant's conduct, the instruction of which defendant complains might have been appropriate. Here, the instruction could have been misleading had the prosecutor sought to establish that the absence of a mitigating factor was itself aggravating. He did not do so, however. In the two instances to which defendant calls our attention, the prosecutor's discussion of factors (d) (defendant under influence of extreme mental or emotional disturbance) and (e) (whether victim was participant in defendant's crime or consented to homicidal conduct) simply referred to the evidence at trial in support of his argument that these potentially mitigating factors were not present. He did not argue that the evidence to which he referred or the conclusions that the jury might reach in light of the evidence established an aggravating factor or factors.

In sum, defendant's argument is really that because the jury was not told that the absence of "evidence" of a mitigating factor should not be deemed aggravating, and was told that it could consider aspects of defendant's background that might offend the conscience,[28] the jury may have considered matters outside the statutory factors. Nothing in the prosecutor's argument invited the jury to do so, however. In the context of the complete set of instructions, and in light of counsel's arguments to the jury, we are satisfied that the jury was not misled in this regard either. The instructions adequately limited the jury to consideration of evidence related to the factors enumerated in section 190.3, and did not permit the jury to deem the absence of a mitigating factor aggravating.

Having concluded that defendant's assignments of error lack merit, we likewise find no merit in his claim that the cumulative prejudicial effect of the "errors" he has identified requires that the penalty be set aside.

---

[28] Moreover, this instruction was requested by defendant, and incorporates language used by this court in *People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776], to describe the process of weighing "sympathetic elements of defendant's background against those that may offend the conscience." The court initially refused the instruction, but reconsidered after *defendant* called attention to *Haskett*.

F. *Intercase Proportionality Review/Cruel or Unusual Punishment.*

 Defendant claims that the death penalty is disproportionate to his culpability when compared with other, similar cases in which lesser sentences are "usually" imposed. He asks the court to exercise its power under article I, section 17, of the California Constitution to find that the penalty is constitutionally impermissible as cruel or unusual punishment. He claims also that if intercase comparison is not afforded in capital cases these defendants will be denied due process and equal protection, that type of review being required by statute for felony defendants sentenced under the Determinate Sentencing Act to lesser penalties. (§ 1170, subd. (f).)

The latter claim has been rejected in several recent cases (see e.g., *People v. Melton* (1988) 44 Cal.3d 713, 771 [244 Cal.Rptr. 867, 750 P.2d 741]; *People v. Brown, supra, ante,* at. pp. 461-462; *People v. Allen, supra,* 42 Cal.3d 1222, 1286-1288), and need not be reconsidered here.

Although intercase proportionality review is not required by the cruel and unusual punishment provisions of the Eighth Amendment, the imposition of the death penalty is subject to review under article I, section 17 of the California Constitution. In so doing we apply the standards heretofore enunciated in *People v. Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697] and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921], to ensure that the penalty is not disproportionate to the defendant's individual culpability. Having done so in this case we cannot conclude that the penalty is disproportionate to the offense or the offender.

In what appears to have been a coldly calculated plan defendant kidnapped two women off the street in the middle of the day for the purpose of rape, intending to kill both in order to avoid capture. That only one victim died was sheer happenstance. The manner in which he committed the murder and attempted murder was particularly cruel—the victims were forced to walk to the site selected by defendant for their execution, were told of his plan, and were subjected not only to multiple gunshot wounds, but also to his further attempt to ensure their death by dropping heavy rocks on their heads. These offenses were not the first, nor were they the last, in which defendant, to satisfy his own carnal desire, kidnapped women for the purpose of rape, having succeeded in accomplishing this goal twice before. The impact of prior punishment by imprisonment for these acts had not been a deterrent. Rather, defendant continued his pattern of sexual abuse of women with an added component of a calculated plan to kill his victims to avoid additional punishment himself. The argument that imposition of the death penalty for this conduct is disproportionate to defendant's culpability is devoid of merit.

### G. "Yurko Error" in Admission of Priors.

 Prior to accepting a defendant's admission that he has suffered a prior conviction, when that prior is charged for the purpose of enhancing a term imposed under the Determinate Sentencing Act, the court must advise the defendant of, and obtain on the record, express waivers by the defendant of the constitutional rights he waives by his admission. The court must also advise the defendant of the impact the finding of prior conviction will have on his term. If the advice and waivers do not appear on the record the finding must be set aside on appeal if prejudice appears. (*In re Yurko* (1974) 10 Cal.3d 857, 863-864 [112 Cal.Rptr. 513, 519 P.2d 561].)

 Defendant claims that the advice given to him regarding the impact of admitting the two prior convictions with which he was charged was erroneous, in that the court stated that his determinate term would be enhanced by five years for each conviction if he was convicted of rape or a three-year enhancement if he were to be convicted of another offense.[29] In fact, after defendant admitted the 1976 prior, and having waived his right to jury trial on the other prior, the court imposed consecutive 10-year enhancements for each prior pursuant to section 667.6, subdivision (b).[30]

The People note that defendant did not admit the 1971 prior, and also argue that defendant does not contend that had he been properly advised he would not have admitted the 1976 rape and that it is unlikely that had he been properly advised he would have submitted the truth of the 1971 prior conviction charge to the jury. On that basis they contend that the error was not prejudicial.

Since defendant raises this issue on appeal, whether there is reversible error as to this issue must be determined on the basis of the appellate record. Defendant is entitled to have the findings set aside if the court failed to substantially comply with the *Yurko* requirements (*supra,* 10 Cal.3d 857) unless the record clearly establishes the lack of prejudice.

We are satisfied that defendant's waiver of his right to have a jury determine the truth of the allegation of the prior convictions was not affected in

---

[29] Defendant also complains that at an earlier time the court had stated that each prior conviction could result in a three-year enhancement, for a total enhancement of six years. He does not explain the relevance of that advice, however, conceding that at the time he offered to admit one of the two priors, the 1976 conviction for rape, the court told him that each prior could result in a five-year enhancement.

[30] Subdivision (b) of section 667.6 provides in pertinent part: "Any person convicted of an offense specified in subdivision (a) [which includes rape] who has served two or more prior prison terms as defined in Section 667.5 for any offense specified in subdivision (a), shall receive a 10-year enhancement for each of those prior terms provided that no additional enhancement shall be imposed under this subdivision for any prison term served prior to a period of 10 years in which the person remained free of both prison custody and the commission of an offense which results in a felony conviction."

any way by the court's error in advising him of the enhancement to his term. On each occasion on which the subject of the priors was discussed defendant indicated his understanding of the potential impact of having the jury learn of his prior convictions for rape. He also recognized the relative simplicity of the proof.

Under the circumstances of this case, the record adequately demonstrates that defendant's decision to admit one prior and to waive his right to jury trial on the other was not influenced by the erroneous advice regarding the length of the enhancement.

### H. *Motion to Reduce Penalty.*

 Defendant claims that statements by the trial judge in denying the motion for reduction of penalty (§ 190.4, subd. (e)) reveal that the denial of the motion resulted from a misunderstanding of the aggravating and mitigating factors. In support of this claim defendant notes that the court referred to the fact that he was on parole at the time of the 1976 Santa Clara County rape, and said that "the court finds that the defendant's conduct outside of state prison is an aggravating factor rather than a mitigating factor." Defendant argues that this reflects consideration of a nonstatutory aggravating factor—the failure to perform satisfactorily on parole.[31]

 Except for evidence offered in rebuttal to mitigating evidence presented by the defendant, under the 1978 death penalty law evidence offered by the People at the penalty phase must be related to a statutory aggravating factor. "Evidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." (*People v. Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782].) We do not understand the court to have referred to or relied on a nonstatutory aggravating factor in making this statement, however. The statement was made at the conclusion of the court's review of the statutory factors, and was made with reference to "factor (k)"—"Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).)

In context, the remark was clearly a reference back to defendant's prior violent criminal activity, an aggravating factor under factor (b) of section 190.3. After finding no mitigating factor other than defendant's satisfactory

---

[31] Under the Sentencing Rules for the Superior Courts (Cal. Rules of Court, rules 401 et seq., 421(b)(5)), unsatisfactory performance on probation or parole is an aggravating circumstance. Those rules apply only to terms imposed pursuant to the Determinate Sentencing Act, however. (§ 1170.3.)

conduct in prison, the court stated: "In this regard, the court notes that the defendant's character, background, history, mental condition, and physical condition, do not, in any way, constitute a mitgating factor, but that his prior history involving two prior felony convictions for rape constitute a—constitute an aggravating factor, while his performance in state prison would and could constitute a mitigating factor. However, since defendant was on parole at the time of the commission of the rape in Santa Clara County, and was on parole at the time of the commission of the instant offense, the court finds that defendant's conduct outside of state prison is an aggravating factor rather than a mitigating factor."

Defendant also claims that the court considered the fact that he was not an accomplice with minor participation to be an aggravating factor, and expressed his belief that the absence of a mitigating factor could in itself be aggravating. He relies on this statement made by the judge with reference to "factor (j)": "The evidence adduced before this court clearly proves that the defendant acted alone and that his sole participation in the commission of the murder was not minor, but that, in fact, defendant was the person who inflicted the injuries upon the victim which were the cause of the victim's death. The court, therefore, finds that this is an aggravating factor rather than a mitigating factor."

The People concede that this statement is susceptible to the interpretation placed on it by defendant, although an alternative interpretation is that the court was simply referring to the circumstances of the crimes committed by defendant as aggravating. Whichever interpretation is placed on the statement, however, and even assuming that the court believed that the absence of this mitigating factor could be aggravating, we do not believe that misunderstanding was prejudicial. Upon review of the full statement by the court in denying the motion to modify the penalty, we are satisfied that this error, if it was such, had no impact on the court's decision to deny the motion. Recognition of the relative insignificance of the mitigating evidence, when compared with the many other aggravating factors, is clearly reflected in the court's explanation of the decision to deny the motion.

### I. *Double Counting of Aggravating Factor.*

Defendant next claims that the trial court prejudicially erred by "double counting" the circumstances of the offenses of which he was convicted in this case under both "factors (a)" ["the circumstances of the crime of which the defendant was convicted in the present proceedings and the existence of any special circumstances found to be true . . ."] and "(b)" ["the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"] of section 190.3. The court did, as

defendant notes, discuss the offenses committed against Ms. D. in the examination of each factor.

We have construed "factor (b)" as "limited to conduct other than the immediate circumstances for which the death penalty is being contemplated." (*People* v. *Melton, supra,* 44 Cal.3d 713, 763; *People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803].) Again, however, the error was harmless. The trial judge did not undertake this independent examination of the evidence with an understanding that the number of aggravating circumstances was significant in determining whether the aggravating factors outweighed the mitigating. Therefore, although he believed that the offenses against Ms. D. were relevant to both "factor (a)" and "factor (b)" there is no suggestion that he gave them additional weight for that reason. In addition, his consideration of "factor (b)" was not limited to the offenses against Ms. D., but included the offenses committed in the Marin-Sonoma kidnapping of Ms. Coffler, Ms. Dobbs, and Ms. Dobbs's infant child; the attempted rape of Ms. Coffler; and the violent struggle with Ms. Dobbs.

## IV

### HABEAS CORPUS CLAIM

In the petition for writ of habeas corpus which he has filed in conjunction with this appeal, defendant claims that counsel rendered constitutionally inadequate assistance at the guilt phase of the trial in stipulating to the admission of the preliminary hearing testimony of defendant's brother, Kevin Jones. Although admissible over a hearsay objection as the testimony of a witness who was unavailable (Evid. Code, §§ 1291, subd. (a)(2); 240 subd. (a)(3)), had an objection been made the evidence should have been excluded as irrelevant to any issue the People were required to establish.[32]

The prosecutor had presented the evidence as a predicate for the subsequent introduction of Kevin's inconsistent statements to Officer Southern.[33] After the preliminary hearing testimony had been read to the jury and the statements to Officer Southern had been admitted, the prosecutor advised

---

[32] Kevin's testimony that he, defendant, and their mother had driven to Placerville together on the morning of July 8, 1981, and had returned to their home between 9:30 and 10 a.m., remaining there until evening except for the trip to Georgetown for beer, did not constitute direct or circumstantial evidence that defendant had perpetrated the offenses. His testimony that defendant did not have a moustache on that morning, having shaved it off a week before, was similarly exculpatory rather than incriminating.

[33] In those statements, Kevin said that defendant had gone to Placerville alone on the morning of July 8, 1981; and that defendant had a moustache on that day which he shaved off on the following morning, telling Kevin to say that he had shaved it off a week earlier.

the court that he had since become aware of this court's decision in *People v. Williams* (1976) 16 Cal.3d 663 [128 Cal.Rptr. 888, 547 P.2d 1000]. In *Williams,* we had held that the hearsay exception of Evidence Code section 1235, for prior inconsistent statements, applies only to prior statements of a witness who actually testifies at the trial. (16 Cal.3d at p. 669.) The prosecutor then asked the court: (1) to instruct the jury to disregard a prior instruction that Kevin's statements to Officer Southern could be considered for their truth if the jury was satisfied that Kevin was not telling the truth in his testimony when he claimed not to recall his earlier statements, and (2) to advise the jury that Kevin's statements to Officer Southern could be considered only for impeachment. The court instructed defense counsel to draft an appropriate instruction, but before such an instruction was given defense counsel told the court that he did not wish to have the limiting instruction. He stipulated that Officer Southern's testimony could be used for all purposes, stating that he did so for tactical purposes.

Defendant claims in his petition for writ of habeas corpus that his counsel's failure to object to the admission of Kevin's preliminary examination testimony, and his stipulation that the statements made by Kevin to Officer Southern should not be stricken, were not the product of a reasonable, informed tactical decision, but were a result of his ignorance of the rule of *People v. Williams, supra,* 16 Cal.3d 663. Although defendant claimed that this allegation was supported by declarations of his trial counsel, in fact the declaration of the lead counsel, the El Dorado County Public Defender, stated that counsel was aware of *Williams* at the commencement of trial and was aware that Kevin's inconsistent statements could have been kept from the jury. His purpose, he declared, was to put those statements before the jury in the hope that he could persuade the jury to believe at least one part of Kevin's testimony—that defendant had arrived home from Placerville on July 8, 1981, by 10 a.m. He also wanted the jury to be fully aware of the conduct of the officers who interviewed Kevin, so that the jury could consider that conduct in eliciting his various statements. In his opinion the prosecutor's concession that "the testimony of Detective Southern fell within the provisions of Evidence Code Section 1235 [*sic*] was an attempt by him to minimize what he considered might be damaging evidence about Kevin Jones' alibi for 10:00 a.m. on Wednesday."

The declaration of defendant's second attorney was simply to the effect that he had not done research prior to commencment of trial regarding Kevin's statements and did not recall if he had discussed the "*Williams* issue" with cocounsel. He did recall that he and cocounsel had discussed the limiting instructions with defendant, and that Kevin had corroborated the issue of defendant being home during the early morning hours.

Notwithstanding the conclusory nature of the allegations of the petition with respect to counsel's awareness of the law and tactical decision, and the

failure of the declarations of trial counsel to support those allegations, we issued an order to show cause. In the return, respondent alleges that lead trial counsel was aware of the legal authority pursuant to which the evidence from Kevin could have been entirely excluded, but decided to accede to its admission in order to provide corroboration for defendant's alibi defense. Respondent also argues that this decision was an informed and legitimate tactical decision, and that even if it was not so, defendant has failed to demonstrate that he was prejudiced by counsel's actions.

The return is supported by additional declarations by defendant's lead trial counsel. The first of these declarations states that the initial declaration was in error in stating that the prosecutor had conceded that the testimony of Officer Southern came within Evidence Code section 1235, and he declared that it was error under *Williams, supra,* 16 Cal.3d 663. Another declaration states that counsel was aware before trial that defendant's mother had given police a version of facts inconsistent with defendant's testimony, had attempted to give an alibi for defendant in a rape case in another county, and had refused to testify at the guilt phase of the trial. As a result, the only possible corroborating witness for defendant's story was Kevin.

Defendant filed a denial to the return. (See § 1484.) He has not offered an affidavit or declaration controverting those of trial counsel. Instead he simply denies the allegations of the return that lead trial counsel was aware of legal authority which could have excluded Kevin's testimony and statements, and that the decision to admit them was an informed tactical decision. On the basis of his denials he asks that we order an evidentiary hearing to "determine the material factual issues in dispute in this action."

There are, however, no factual disputes the resolution of which is necessary to the disposition of this petition. "In a habeas corpus proceeding the return to the writ or order to show cause alleges facts tending to establish the legality of the challenged detention and is analogous to the complaint in a civil proceeding. [Citations.] The traverse, and the petition where by stipulation or acquiescence it is treated as a traverse [citation], are analogous to the answer in a civil proceeding, and the petitioner 'may deny or controvert any of the material facts or matters set forth in the return . . . or allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge . . .' (Pen. Code, § 1484; [citations].) ▮▮ The issues are joined in this manner, and 'new matter set up in the petition [and traverse] which tends to invalidate the apparent effect of the process set forth in the return is deemed denied and must be proved by the party alleging it, namely the petitioner.' [Citation.]" (*In re Saunders* (1970) 2 Cal.3d 1033, 1047-1048 [88 Cal.Rptr. 633, 472 P.2d 921].)

 Where there are no disputed factual questions as to matters outside the trial record, the merits of a habeas corpus petition can be decided without an evidentiary hearing. (*In re Lewallen* (1979) 23 Cal.3d 274, 278 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823].) Defendant's request for an evidentiary hearing may be based on his belief that his conclusionary assertion in the petition that counsel was unaware of *Williams, supra,* 16 Cal.3d 663, and did not make an informed, tactical decision to put Kevin's testimony before the jury, and his denial of the allegations of the return and declarations are sufficient to create a factual dispute. They are not. Unless controverted the allegations of the return are deemed true. (*In re Bower* (1985) 38 Cal.3d 865, 873 [215 Cal.Rptr. 267, 700 P.2d 1269]; *In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257].) While defendant has denied the allegations, he has not and apparently cannot offer proof that the declarations of counsel are untrue.

 When a habeas corpus petition is prepared by the defendant in propria persona, we require that he "allege with particularity the facts upon which he would have a final judgment overturned." (*In re Swain* (1949) 34 Cal.2d 300, 304 [209 P.2d 793].) This rule applies with even greater force when a petition is prepared by counsel. Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing. In this case, the only support defendant offers for his allegation that counsel was ignorant of the legal basis on which Kevin's testimony might have been excluded is speculative.[34] "The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter." (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].)

 More importantly, however, neither the allegations of the petition, nor the denials of the allegations of the return, address the crucial decision of counsel that was made at the time the limiting instruction was to be given. We find nothing to suggest that counsel's decision at that point to permit the jury to consider Kevin's extrajudicial statements was made in ignorance of the law, or was not, in fact, a tactical decision. Therefore, even

---

[34] In his petition, it was argued that counsel's explanation of his actions "made no sense." Defendant was therefore relying only on the record and his deductive reasoning for the assertion that counsel was ignorant of *Williams, supra,* 16 Cal.3d 663, and did not make a tactical decision to put the evidence before the jury.

Defendant now argues that the truthfulness of the declarations by defense counsel is in doubt because counsel did object initially to the admission of Kevin's extrajudicial statements on grounds that they were not inconsistent with his "I don't remember" responses at the preliminary examination. Had the objection been sustained the evidence that counsel later decided would be helpful to his case would have been excluded. Defendant also notes that counsel initially agreed to draft the limiting instruction, and only later advised the court that he wished the jury to consider the evidence.

were we to consider the allegations of his petition to have been incorporated into the denial, or to assume that respondent has acquiesced in the treatment of the petition as a traverse, no dispositive factual question has been joined by the pleadings.

A further consideration that persuades us that no evidentiary hearing is necessary in this case, is defendant's failure to demonstrate that counsel's decision to permit the jury to consider Kevin's testimony, if uninformed or unwise, demonstrates either that counsel's overall performance was such that it fell below reasonable professional standards or that the lapse resulted in prejudice to the defense.

 "To establish that counsel's assistance was sufficiently ineffective to justify the issuance of a writ of habeas corpus, petitioner must first demonstrate that counsel's performance ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' [Citation.] This determination generally must be made with deference to avoid the dual pitfalls of second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel 'to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . .' " (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370]. See also *Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 1052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

Defendant must also show that if counsel's performance fell below acceptable standards in some respect, a reasonable probability exists that a more favorable outcome would have been reached absent the deficient performance. (*In re Cordero, supra,* 46 Cal.3d 161, 180.) That probability must be one sufficient to undermine confidence in the outcome of the trial. (*Ibid.*; *Strickland* v. *Washington, supra,* 466 U.S. 668, 692 [80 L.Ed.2d 674, 696].)

 Having reviewed the entire record in this case we cannot accept defendant's premise that counsel's decision to permit the jury to hear Kevin's testimony and extrajudicial statements was one that no competent criminal defense attorney would make, nor do we believe that, even if the decision were questionable, counsel's overall performance was thereby rendered constitutionally deficient. We agree with the trial judge who presided over the proceedings that defendant was "well and fully represented by counsel." Finally, we conclude in light of the overwhelming evidence of defendant's guilt that there is no reasonable probability that had Kevin's testimony and/or his extrajudicial statements been excluded the outcome would have differed in any way.

V

The order to show cause is discharged and the petition for writ of habeas corpus is denied. The judgment is affirmed in all respects.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied November 17, 1988.