Filed 9/15/15  P. v. Corado CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO FLORES CORADO et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B252970<br>(Super. Ct. No. BA394921)<br>(Los Angeles County) |

In *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), our Supreme Court held that a defendant is entitled to discover the personnel records of misconduct of officers when there is a factual dispute about what transpired, coupled with a plausible scenario that exculpates the accused.  Here appellants sought records of officers' dishonest misconduct, including the fabrication of evidence.  As we shall explain, their *Pitchess* requests raised no dispute about the officers' descriptions of significant objective facts and conduct, such as the locations, quantity and value of the seized drugs, and appellants' presence in the car and residence from which the drugs were seized.  *Pitchess* relief is not available where, as here, appellants' requests challenged the officers' descriptions of the motive underlying their conduct, rather than the actual conduct or other significant objective facts.

Armando Flores Corado and Jose Saul Ortiz appeal from the judgment following their convictions by jury of six counts of assault with a deadly weapon (vehicle) upon a peace officer (Pen. Code, § 245, subd. (c), counts 1-6); conspiring to commit a crime (*id.*, § 182, count 7); selling/offering to sell or transportation of a controlled substance (methamphetamine) (Health & Saf. Code, § 11379, subd. (a), count 8); possession for sale of a controlled substance (*id.*, § 11378, count 9); and possession of a controlled substance with a firearm (*id.*, § 11370.1, subd. (a), count 10). Ortiz was also convicted of possession of an assault weapon (Pen. Code, § 30605, subd. (a), count 11). The jury found true an excess weight allegation (Health & Saf. Code, §11370.4, subd. (b)(3)), and personal firearm allegations as to counts 7 and 9 (Pen. Code, § 12022, subd. (c)), but found untrue a personal firearm allegation as to count 8. The trial court sentenced Corado to a 24-year prison term and Ortiz to a prison term of 24 years 8 months

Appellants contend that the trial court erred by (1) denying their *Pitchess* motions and failing to order the disclosure of personnel records of several officers involved in the events underlying their convictions; and (2) admitting narcotics trafficking evidence. We reject both contentions. The court ordered the disclosure of the personnel records of one officer (Devon Harden) for use of excessive force. Appellants also request we independently review the in camera proceedings concerning the disclosed records; we have done so. There is no error in the in camera proceedings.

Corado further contends, and respondent appropriately agrees, that the abstract of judgment must be amended to correctly reflect Corado's count 10 sentence and the conduct credits that the court awarded him. We affirm and direct the trial court to amend the abstract of judgment to correctly reflect Corado's sentence.

FACTUAL BACKGROUND

*Prosecution Evidence*

In March 2012, several local law enforcement agency officers and federal Drug Enforcement Authority (DEA) agents were part of a narcotics trafficking task force. Their investigation led to appellants' arrests on March 8. The task force included Los Angeles County Sheriff's Office Detectives David Faria, Rudy Contreras, Wil Escalante, Laurence Zimmerman and Joe Gutierrez; La Verne Police Officer Devon Harden; Culver City Police Sergeant Manuel Cid; and DEA Agents Gerard Deiparine and Josh Ramirez.

On March 8, Agent Deiparine learned that a man telephoned someone named "Saul" during a wiretapped call and asked if Saul had a "roof." A "roof" is a site where a "courier" unloads narcotics. Narcotics couriers often use vehicles that are equipped with a concealed storage compartment called a "trap." In a subsequent call, the courier said, "It's a matter of opening the hood, and I'll be done in 20 minutes." In a later call, at 1:00 p.m., the courier asked if the call's recipient had an electric drill. (Drills are used to quickly remove a trap from a car engine.) The parties also discussed a location and driving directions, and referred to a black car. Deiparine conveyed the information to Detective Faria, who shared it with the surveillance team. The surveillance team dressed in plain clothing and used unmarked cars equipped with sirens and forward-facing red and blue emergency lights on March 8.

That afternoon, Sergeant Cid took his unmarked car to monitor a residence at 12259 211th Street in Lakewood after receiving information about that location and a black vehicle of interest. Cid saw a black Lexus in the driveway of that address at approximately 3:00 p.m. A man, later identified as Corado, walked away from the Lexus, with a cardboard box under his arm. Cid estimated that the box was about one foot wide, one foot deep and 18 to 24 inches long. A few minutes later, Cid saw Corado outside the residence, without the box. Corado opened a driveway gate

3

for the Lexus, then sat in its front passenger seat and left with the driver (who was later identified as Ortiz).

*Evidence of Assaults Upon Peace Officers (Counts 1-6)*

While driving his unmarked minivan, Officer Harden saw the Lexus traveling north on Elaine Avenue. Harden started to follow the Lexus, which made a sudden U-turn on Elaine Avenue and passed him. Harden waited at a stop sign to turn left onto Pioneer. Detective Gutierrez pulled up, on the right side of Harden's minivan. The Lexus pulled up behind Gutierrez, who turned right. The Lexus followed the minivan when Harden turned left onto Pioneer. The Lexus stayed close behind the minivan, and it appeared to Harden that its driver was using a counter-surveillance technique. The Lexus kept following closely as Harden entered the left-turn lane at 215th Street. Concerned that the Lexus occupants might ambush and harm him, Harden contacted Detective Faria, the surveillance team leader. Faria told Harden to detain them.

Harden stopped the minivan. The Lexus immediately stopped several feet behind it. Detective Faria stopped his vehicle behind the Lexus. Detective Contreras and Agent Ramirez stopped behind Faria in two other vehicles. Faria, Contreras and Ramirez activated the forward-facing red and blue police emergency lights on their unmarked vehicles. Contreras also activated a siren.

Wearing plain clothes and a badge that hung on a chain around his neck, Harden stepped out of the minivan, with a firearm in his hand. He approached the front bumper of the Lexus, on its driver's side, yelled that he was a police officer, and ordered the occupants to show their hands. The Lexus accelerated toward Harden and pursued him as he tried to run away. Ramirez tried to contain the Lexus by cutting in front of it. It struck Ramirez's vehicle and kept moving. Concerned that the Lexus would force him against his minivan and crush his legs, Harden fired three rounds at it.

4

The Lexus passed the right side of Harden's vehicle, went east on 215th Street, and turned north on Elaine Avenue.

Contreras and Harden pursued the Lexus in their vehicles as it drove on Elaine Avenue. Harden activated his emergency lights and siren; Contreras activated his lights. Harden and Contreras followed the Lexus, which entered a parking lot on Elaine Avenue. The Lexus entered from the north driveway; Contreras entered from the south driveway. The Lexus moved toward Contreras's vehicle, at a speed of about 40-45 miles per hour. Contreras fired his weapon at the Lexus and hit the fender. Faria entered the lot through its south driveway. He was getting out of his vehicle, between his car and an adjacent railing, when the Lexus turned toward him while driving at least 45 miles per hour. Fearing that he would be pinned between his vehicle and the railing if the Lexus hit his vehicle after completing its turn, Faria fired at the front of the Lexus. The Lexus left the parking lot via the south driveway, with Contreras, Faria and Harden following it.

The Lexus turned east from Elaine Avenue on 214th Street, to Horst, and struck a marked Los Angeles County Sheriff's patrol vehicle occupied by Deputies Christopher Allende and Daniel Machuca. Allende and Machuca did not participate in the narcotics investigation or the related chase.

The Lexis continued moving south on Horst, turned onto 216th Street, hit a parked truck, and stopped. Officers handcuffed Ortiz and Corado, who fell from the Lexus crying for help. Ortiz had one bullet wound on the back of his neck and another on his right arm. Corado had a bullet wound in his abdomen. One of the arresting officers immediately gave them medical aid.

*Seizure of Drugs and Firearms*

After appellants' detention, officers forcibly entered the 211th Street residence, searched for suspects and weapons, and secured the premises pending the receipt of a search warrant. They searched the residence later that day. In the attached

5

garage, they found a bag with 11 packages of methamphetamine, which collectively weighed 13 pounds, and a cardboard box which held a sealed metal box. The metal box held about 15 pounds of methamphetamine. The cardboard box "strongly resembled" the box Cid saw Corado carry into the residence. The garage also contained materials commonly used for packaging and cleaning narcotics.

Officers located three guns in the master bedroom. A loaded nine-millimeter semiautomatic handgun and a loaded .380 semiautomatic handgun were in a drawer under the bed. An "SKS" assault weapon was in the closet, along with women's and men's clothing. The officers also found bills addressed to Evelyn Pelayo (Evelyn), a photograph of her with Ortiz, and a box of ammunition. The search also revealed a statue of "Saint [Jesus] Malverde," which narcotics traffickers "believe will offer them some sort of protection from law enforcement."

Detective Escalante searched the Lexus. He found a ring with keys to the Lexus and the front door of the 12259 211th Street residence. The Lexus's glove box held Evelyn's temporary automobile insurance paperwork. There was a cellphone in its center console. Ortiz carried another cellphone which displayed a photograph of him and Evelyn. The center console also had a concealed compartment ("trap") that contained $10,000 in paper currency, a digital scale, and a baggie that held 3.58 grams of methamphetamine. Escalante opined that the methamphetamine in the baggie was possessed for sale. The Lexus was registered to Ortiz's friend, Giovanni Ruda. Escalante testified that drug traffickers often use a "straw car," i.e., a car registered in someone else's name, to hide their identity.

The combined weight of the seized methamphetamine exceeded 28 pounds. Detective Faria testified that it would require a large organization to coordinate the importation and distribution of that much methamphetamine. Detective Zimmerman also provided expert testimony concerning narcotics trafficking. He opined that narcotics trafficking organizations hold workers accountable for narcotics

6

and retaliate when narcotics are seized from them. Workers try to avoid capture while carrying narcotics in vehicles and sometimes use counter-surveillance driving techniques. Zimmerman opined that the street value of the seized methamphetamine exceeded "a million dollars." In response to a hypothetical question based on the facts of the instant case, he opined that the seized narcotics were possessed for sale.

*Defense Evidence*

Rose Martinez, Bryan Mismit, and Efrain Alvarez testified that they had known Corado for many years and knew his reputation in their community. They testified that Corado did not have a reputation for being a drug dealer or a violent person. Corado did not testify at trial.

Ortiz testified that he dated Evelyn and they lived together beginning in 2009, after their son was born. They moved into the 211th Street house in September 2011. In December 2011, Ortiz moved into his mother's Los Angeles home because he believed Evelyn was involved with another man. He left his guns, including an assault rifle, at Evelyn's house because his mother would not allow guns in her home.

Ortiz drove a 2002 black Lexus that his friend Ruda loaned him. Ortiz saw his son regularly at a park in Lakewood or at his mother's home, and his son rode in the Lexus with him. Evelyn insured the Lexus because Ortiz did not have a driver's license.

Evelyn's father, Ramon Pelayo, testified that he used to see Ortiz at Evelyn's house when he visited Evelyn from September through December 2011. In December 2011, Pelayo changed the locks on Evelyn's front door and the door from the inside of the house to the garage. Pelayo visited Evelyn's home between January and March 2012, but did not see Ortiz there.

Ortiz testified that on March 8, he was at Corado's home. Between 2:00 and 3:00 p.m., he drove the Lexus to Evelyn's house to visit his son, with Corado. He parked in the driveway and waited while Corado went to see if Evelyn was home.

7

Nobody answered the door, and Ortiz started driving back to Corado's house. He noticed a minivan behind him. Thinking that its driver might be Evelyn's new boyfriend, Ortiz made a U-turn and started tailgating the minivan. The minivan stopped. Ortiz stopped several feet behind it. The minivan's driver got out, with a gun in his hand, and approached Ortiz. Ortiz tried to drive around the minivan. He heard gunshots and felt a "burning sensation" in the back of his neck. Corado held his side and shouted he was shot. Ortiz kept driving. His ears were ringing from the gunshots. He did not hear any sirens.

Ortiz reached a cul-de-sac, turned the Lexus around and entered a parking lot. He did not see any police vehicles. While he was driving near the parking lot exit, Ortiz saw a man follow the Lexus with a weapon in his hand. Ortiz heard a gunshot, felt a burning sensation in his hand, and drove away. Ortiz turned left and collided with a patrol car. He kept driving, turned left again, and hit a truck. He got out of the Lexus and yelled for people to call an ambulance because he had been shot.

Ortiz testified that the drugs seized from Evelyn's house did not belong to him. He was not aware of any hidden compartments or contraband in the Lexus. During cross-examination, Ortiz denied that he had a middle name, or that he had ever used the name "Saul."

At trial, Harden testified that he could not estimate the distance between his minivan and the Lexus when it stopped behind his minivan on March 8, 2012. On cross-examination, Harden admitted that on March 17, 2012, he told an investigator that the Lexus stopped about three feet behind him on March 8. Jesse Wobrock, an accident reconstruction expert and forensic biomechanical engineer, testified that if the vehicles had been that close together, the available turning radius would have been too small for the Lexus to flee without hitting Harden's van.

Patricia Fant, a forensic firearms examiner, described the trajectory of bullet holes in the windshield and driver's side rear window of the Lexus. She opined

8

that the shooter fired the bullets while standing near the rear passenger side of the Lexus.

Thomas Maeweather testified as an expert in field and police procedures, the use of force, task forces, and narcotics. He testified that certain tactics used in this case by officers in plain clothes posed a risk to them. For example, an officer standing in front of a car in plain clothes with a gun, while other officers are behind him, places the officers at risk. Officers are trained to get a uniformed presence at the scene of a high-risk stop. He opined that an officer is not justified in shooting at occupants of a vehicle that no longer poses a danger to the officer.

*Prosecution Rebuttal Evidence*

The March 8, 2012 booking slip for Ortiz named Evelyn as his emergency contact person. The birth certificate for Ortiz's son identifies his father as Jose Saul Ortiz.

DISCUSSION

*Pitchess Claims*

Appellants contend the trial court abused its discretion by denying their *Pitchess* motions and failing to order the disclosure of personnel records of several officers. We disagree.

We review the trial court's denial of a *Pitchess* motion for abuse of discretion. (*People v. Galan* (2009) 178 Cal.App.4th 6, 12.) The discovery of peace officers' civilian complaints or personnel records requires a motion supported by affidavit (declaration) showing good cause, including materiality to the proceeding for which disclosure is sought. (Evid. Code, § 1043, subd. (b).) "This good cause showing is a 'relatively low threshold for discovery.'" (*Garcia v. Superior Court* (2007) 42 Cal.4th 63, 70.) If it is satisfied, the superior court reviews the requested materials for relevancy and consequent disclosure. (*Id*. at pp. 70-71; Evid. Code, § 1045.)

9

To establish materiality, the supporting declaration must first propose a defense to the charges, and explain how the discovery would support it. Counsel also must describe a factual scenario of officer misconduct, which may consist of a denial of the facts stated by the arrest report. The defense scenario must be plausible, in light of the other documentation. A plausible scenario is one that might or could have occurred. It must be internally consistent and support the proposed defense. The defendant must show that the information sought could lead to, or constitute, evidence potentially admissible at trial. (*Garcia v. Superior Court*, *supra*, 42 Cal.4th at pp. 70-71; *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024-1026.)

*Relevant Proceedings*

Before trial, Corado and Ortiz filed separate pretrial *Pitchess* motions seeking the personnel records of certain officers involved in the March 8 incident. Corado requested police personnel records of Deputies Allende and Machuca; Detectives Contreras, Faria, and Zimmerman; Officer Harden; and Sergeant Cid. He sought records of complaints "relating to acts of violation of constitutional rights, fabrication of charges, fabrication of evidence, fabrication of reasonable suspicion and/or probable cause, illegal search/seizure; false arrest, perjury, dishonesty, writing of false police reports, unlawful use of force and any other evidence of misconduct amounting to moral turpitude."

The supporting declaration of Corado's counsel stated: "Deputies Allende and Machuca falsely claim that . . . Ortiz intentionally rammed their vehicle with his. This is untrue. Ortiz was attempt[ing] to avoid the officers [and] he did not know [they were] law enforcement officers. A forensic report completed during the investigation concluded that the collision was the result of a 'side-swipe' as opposed to a direct frontal collision as falsely claimed by Allende and Machuca. [¶] Contreras and Faria claimed that . . . Ortiz drove his vehicle directly at them in a hostile manner. This is patently false. The testimony at the preliminary hearing of Contreras and

10

others establishes that neither Contreras nor his vehicle was in the path of or blocked Ortiz's ability to get out of the parking lot where the incident occurred. [¶] "Harden falsely claims that [Ortiz] drove his car directly towards him in an attempt to hit him from a distance of three feet but somehow managed to miss him and his vehicle. This again is a false claim by an out of control officer who fired his weapon into the side of Ortiz's car with the intent to kill . . . Corado, who miraculously survived the bullet that entered the side of his body."

Counsel for Corado further declared that "[i]n the police reports and in his sworn testimony at the preliminary hearing examination, Sergeant Manuel Cid testified falsely that he observed . . . Corado carry a cardboard box into a house that was under surveillance by narcotics officers. Cid later testified that a cardboard box full of narcotics found later in the same house was the same as or similar to the box he saw . . . Corado carry into the house." Counsel declared that Cid's testimony was "patently untrue," and that "Corado did not carry a cardboard box full of narcotics into the house, he carried only a bag of food from a fast food restaurant into the house." Counsel declared that "[t]he bag of food was so small that it is not possible that one could mistake it for a large cardboard box."

Corado's counsel further stated that Detective Zimmerman "conspired" with Sergeant Cid, who provided false testimony regarding Corado. The conspiracy encompassed Zimmerman's preparation of "summary incident reports based upon statements from [Cid, Allende, Machuca, Contreras, Faria and Harden]" and testimony "regarding the search of a residence where narcotics were recovered."

Counsel for Corado asserted that the requested records were relevant to show the officers have a propensity to engage in the alleged misconduct, and that they engaged in "misconduct of the type alleged in this case." He also asserted the evidence was necessary to cross-examine the officers and impeach their credibility.

11

Ortiz sought personnel records of all officers sought by Corado, as well as records of Detective Escalante and Sergeant B. Bryant pertaining to complaints "involving falsification of testimony, fabrication of evidence, false police reports, aggressive behavior, racial or gender bias, violence, excessive force, or attempted violence or excessive force and any additional acts involving dishonesty, criminal conduct and/or moral turpitude." The statements in the declaration of Ortiz's counsel concerning Harden, Contreras, Faria, Allende, Machuca, Cid, essentially mirrored those made by counsel for Corado, as described above.

In addition, the declaration of counsel for Ortiz included statements regarding Sergeant B. Bryant and Detectives Zimmerman and Escalante. Ortiz's counsel declared that Zimmerman and Escalante prepared summary incident reports based upon statements of other officers; that Zimmerman testified about the search of the residence where officers recovered narcotics; and Escalante prepared summary reports of statements of civilian witnesses, and testified about contraband seized from the Lexus. Counsel stated that Bryant "was responsible" for reports prepared by Zimmerman, Escalante and others.

At the hearing on the *Pitchess* motion, the trial court indicated it believed discovery was proper only as to Officer Harden and only as to any prior excessive force complaints. Appellants argued that the court should also order discovery of records relating to dishonesty as to all officers who were named as victims because they had every motive to make up whatever story was necessary to justify their March 8 conduct. The court ruled that the declarations did not suggest the officers were lying about the events described in the officers' reports and testimony, even if the court accepted appellants' declarations as true. For example, the court stated it was a matter of perception whether Ortiz struck the patrol vehicle intentionally or because he lost control of the Lexus.

12

The statements in counsels' declarations are not unlike those in *People v. Thompson* (2006) 141 Cal.App.4th 1312, where an undercover police officer arrested the defendant after purchasing drugs from him. The "*Pitchess* motion seeking discovery of the personnel records of numerous officers involved in the undercover sting operation" contained the defendants denial of "all the allegations contained in the police report." (*People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1341.) The *Thompson* trial court denied the motion. In affirming that ruling this court concluded the defendant failed to provide a factual showing that was "plausible by any rational standard," because he did not "present a factual account of the scope of the alleged police misconduct, and [did] not explain his own actions in a manner that adequately support[ed] his defense." (*Thompson*, *supra*, at pp. 1315, 1317.)

Here, the declarations in support of the appellants' *Pitchess* motions failed to provide facts that disputed the events and significant facts described in the officers' reports and testimony. For example, the declarations did not dispute that the Lexus tailgated Harden or stopped right behind him. They challenged the veracity of Contreras's and Faria's claims that Ortiz drove his vehicle directly at them in a hostile manner but failed to present facts that support their challenges. They asserted that "[t]he testimony at the preliminary hearing of Contreras and others establishes that neither Contreras nor his vehicle was in the path of or blocked Ortiz's ability to get out of the parking lot where the incident occurred." Ortiz could have driven at the officers whether or not they or their vehicles were blocking him. Appellants' declarations challenged one detail of Cid's testimony–the size and nature of the item that Corado carried into the 211th Street residence. They did not, however, dispute Cid's testimony that Corado entered that residence briefly at about 3:00 p.m. on March 8, and left the scene with Ortiz in the Lexus. The trial court properly exercised its discretion in denying appellants' *Pitchess* motions because they did not establish "good cause for the requested discovery." (*Thompson*, *supra*, at p. 1317.)

13

*Narcotics Trafficking Evidence*

Appellants contend that the trial court violated their due process rights and Evidence Code section 352 by admitting irrelevant and prejudicial narcotics trafficking evidence. We disagree.

Relevant evidence is all evidence "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has "wide discretion in determining relevance under this standard." (*People v. Kelly* (1992) 1 Cal.4th 495, 523.) It also has discretion to exclude any evidence under Evidence Code section 352 if it is more prejudicial than probative. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

*Relevant Proceedings*

During trial, Detective Zimmerman testified that objects found in the house consistent with narcotics trafficking included "a shrine." Following an Evidence Code section 352 objection, the court heard argument at sidebar. The prosecutor explained that the shrine was to Malverde, "the patron saint of narco trafficking." Appellants collectively objected that the prosecution was "trying to say that it's part of drug cartel symbolism" and such evidence would "[i]nflame the jury." The court ruled that the prosecution could present evidence regarding Malverde, except "the cartel part of it," which was more prejudicial than probative under Evidence Code section 352. The court directed the prosecutor to instruct Zimmerman not to use the term "cartel." Zimmerman later testified that two magazines found in the house were relevant to narcotics trafficking. He explained they had articles "about the Mexican cartels," including one of "probably one of the most wanted men in the world, El Chapo Guzman." The court struck the response and admonished the prosecutor to remind Zimmerman again about its ruling.

The prosecutor sought Zimmerman's opinion on whether someone who possessed narcotics with a value exceeding a million dollars would "entrust that amount, or anything remotely like that amount to an unwitting -- someone without knowledge of what was going on." Zimmerman answered, "absolutely not," but had difficulty explaining his answer without violating the court's ruling. The court ruled that he could use the term "trafficking organizations" or "major drug dealers" instead of "cartel" because "cartel" conjured up "assassinations in Mexico [and] the pits where they found beheaded individuals."

Over appellants' objection, the trial court allowed the prosecution to present evidence regarding the consequences narcotics workers may face if money or narcotics in their possession is seized from them. Zimmerman opined that narcotics trafficking organizations hold people who possess the organization's narcotics "and

15

potentially their family members" accountable for the narcotics they lose. In another sidebar conference, the court overruled an objection that the term "organization" was the same as "cartel." The court stated that "'cartel' evokes a lot of negativity," while "'Organization' means there's someone above you. It just means it's organized." Zimmerman testified that an organization that owns drugs could harm its workers, or their family members, if the organization's drugs were seized from the worker. Later in trial, Detective Faria opined that an organization, not one or two people, was required to move 12 kilograms of methamphetamine.

In the context of the evidence presented at trial, the challenged testimony was not unduly "unique[]" evidence which "tends to evoke an emotional bias against" appellants. (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.) The officers seized methamphetamine with a value in excess of a million dollars from a small home owned by Evelyn, the mother of Ortiz's son. Jurors would not be inflamed to learn that such "property" belonged to an organization, rather than the individuals who transported or possessed it prior to its seizure. On the date of the seizure, Ortiz possessed a key to Evelyn's residence. He admitted he owned the three firearms, including the assault weapon, which officers seized from Evelyn's home. Ortiz was driving the Lexus immediately before the officers located $10,000, a baggie with methamphetamine and a scale concealed in its console. He acknowledged that he regularly drove the Lexus, which was registered to another man, and that Evelyn insured it. The wiretapped telephone conversations that occurred just hours before the officers located the methamphetamine at Evelyn's small home involved at least three people. There was undisputed evidence that Corado was with Ortiz during the hours before their detention. The trial court did not abuse its discretion by admitting the challenged testimony.

16

*Corado's Abstract of Judgment*

Corado and respondent correctly state that the abstract of judgment does not correspond with the sentence imposed upon him by the trial court. First, although the court ordered that Corado's sentence for count 10 should run concurrently, the abstract of judgment indicates that he received a consecutive sentence for that count. Second, the abstract also fails to reflect that the court awarded Corado 1,240 days of presentence custody credits, including 620 days of actual custody credit and 620 days of conduct credit.

DISPOSITION

The judgment is affirmed. On remand, the court shall amend the abstract of judgment to reflect Corado received a concurrent sentence for count 10, and that the court awarded him 1,240 days of presentence custody credits (620 days of actual custody credit and 620 days of conduct credit). The court shall submit a certified copy of the amended abstract to the Department of Corrections.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

17

George G. Lomeli, Judge

Laura F. Priver, Judge

Superior Court County of Los Angeles

_____

Cynthia L. Barnes, under appointment by the Court of Appeal, Armando Flores Corado.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Jose Saul Ortiz.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, William H. Shin, Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.