Filed 6/8/23  P. v. Wilson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096080 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE006762) |
| v. | |
| PHILLIP WILSON, | |
| Defendant and Appellant. | |

A jury found defendant Phillip Wilson guilty of the first degree murder of Robin B. and found true the allegation that defendant committed the murder while raping the victim.  Defendant raises two issues on appeal.  First, he contends the trial court erred by excluding testimony about prior acts of domestic violence by a third party (Norbert Holston) perpetrated by Holston against his ex-wives, where defendant argued that it was Holston who killed Robin.  Second, defendant contends the court erred by allowing testimony about records discovered on a hard drive found in his apartment that showed a

1

connected computer had accessed pornographic videos on the Internet. Disagreeing, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 1980, a coworker went to Robin's apartment after Robin missed a shift at the nearby donut shop where they both worked. The coworker found Robin lying face down, naked, submerged in a sliced-open water bed. Robin had one arm behind her back and lines and abrasions around her wrists.

A

*Police Investigations*

When police arrived, officers photographed and recorded video of the apartment; collected samples from spots of blood on the living room wall, baseboard, and sliding door; and collected fingerprints from the bedroom windowsill. The doctor who conducted an autopsy of Robin concluded that one of five stab wounds to her chest had pierced her heart and caused her death, with drowning possibly contributing as well. Two of the stab wounds pierced Robin's liver, which the testifying doctor concluded were also potentially fatal. The doctor also took vaginal swabs and found sperm on them.

At the time of the murder, defendant lived with his wife Val D. in the same apartment complex as Robin. A police officer came to their apartment and asked defendant and Val if they knew anything about what happened. They told the officer they did not. Police also interviewed Holston, who was romantically involved with and lived with Robin's sister Maria at the time.

In 2004, the investigation resumed when the sheriff's department developed a DNA profile for a suspect. Then, in 2019 and 2020, the investigators developed a new lead that led to further investigation of defendant.

B

*Evidence of Defendant's Culpability*

1.    *DNA Analysis*

The DNA analysis for the vaginal swabs taken from Robin included defendant as a potential contributor to the DNA taken from the swabs and showed it was 200 octillion times more likely that defendant and Robin contributed to the DNA than it was that Robin and a random unrelated individual contributed.  The DNA analysis of the blood collected from the wall of Robin's apartment excluded Robin as a contributor and showed it was 30 quadrillion times more likely that defendant contributed the DNA in the blood than a random unrelated individual.  The DNA analysis of the blood collected from the baseboard of Robin's apartment excluded Robin as a contributor and showed it was 200,000 times more likely that defendant contributed the DNA in the blood than a random unrelated individual.  The DNA analysis of the blood collected from the sliding door frame of Robin's apartment excluded Robin as a contributor and showed it was 2 septillion times more likely that defendant contributed the DNA in the blood than a random unrelated individual.

2.    *Finger and Palm Prints*

In 2020, a police forensic identification specialist analyzed fingerprints found on the interior bottom side of Robin's bedroom windowsill and determined they matched defendant's fingerprints.  The placement of the prints was consistent with someone outside reaching in, either to come in or go out of the window.  The specialist also analyzed a palm print found on the top of the interior windowsill and determined it matched defendant's palm print.

3.    *Inconsistencies in Defendant's Testimony*

After police arrested defendant in 2020, police detectives interviewed him.  Prior to the detectives mentioning Robin, defendant claimed that he dated a woman who worked at the donut shop and lived in the same apartment complex as him.  He never

3

went in the woman's apartment and never had sex with her. He did not recognize a picture of Robin. After the detectives told defendant that Robin had been killed, defendant remembered detectives going around the complex talking to everybody, including him, at the time of the murder.

At trial, defendant testified he met Robin when she caught him smoking marijuana by the pool at their apartment complex. He later asked her if she wanted to smoke after work, and they began occasionally smoking together outside her patio door or by the pool. Defendant occasionally hung out with Robin in her apartment. He had consensual sex with Robin the night before she was murdered and left her apartment around 2:00 a.m. The inconsistencies between his interview and trial testimony were due to his health problems, medication, and marijuana use that combined to cause memory problems. By the time of trial, he had not been taking medication or using marijuana for two years, so his memory had improved.

4. *Evidence of Prior Rape of Sharon M.*

Three weeks before Robin's murder, at an apartment less than five miles away, Sharon M. awoke to a very big man with a mask breaking into her room. The man pressed a knife against her neck and told her, "I'm going to have to kill you sweetheart." The man used duct tape to bind her hands behind her back, performed oral sex on her, and then had vaginal sex with her. The man told Sharon to call her "Mr. Valentine" and said he might bring her flowers.

A few days after the rape, someone knocked on Sharon's door, and she looked through the peephole and saw a "tall, big" man "with the same physical look" standing with flowers. Sharon called her apartment manager and reported her rapist had returned. Police found defendant at work and interviewed him about the rape. Defendant admitted being at Sharon's apartment building but said he was bringing a friendship card to a woman he had not seen in one year and did not have flowers with him. Defendant also admitted weighing around 380 pounds at the time, matching the description of the very

4

large suspect, but suggested he was too heavy to climb the fence into Sharon's back patio.

During the renewed investigation of Robin's murder, a forensic identification specialist determined a print on the frame of Sharon's window screen matched defendant's left palm.

5.    *Evidence of Prior Conduct with Val D.*

Before she married defendant, Val lived alone in the apartment next to the one Robin eventually would live in at the time of her murder. Val awoke in the middle of the night to someone tightening a belt around her neck. She opened her eyes and saw defendant. She told him the belt was too tight, so defendant let go and let her take the belt off. Then defendant forcibly performed oral sex on Val and had vaginal sex with her.

After the belt incident, but still before she married defendant, Val was sleeping in bed with another man in a different apartment, and she awoke to someone touching her breast. The man with her was still asleep, but when Val got up to go to the bathroom, she saw someone with big feet standing up against the wall. Based on the size of the feet, Val believed the person was defendant, but she did not look at him because she did not want him to know she had seen him. When she returned from the bathroom, the person was gone.

C

*Evidence of Holston's Culpability*

At trial, defendant's counsel argued Norbert Holston had murdered Robin. Police interviewed Holston at the time of Robin's murder because, about one week before the murder, he and Maria got into an argument, and Maria left their home to see Robin. Robin was working at the donut shop at the time. Robin introduced Maria to James Ezell, then a sergeant with the Sacramento County Sheriff's Department, who was a customer and an acquaintance of Robin. The sisters told Ezell that Maria was afraid to

5

return home because Holston might hurt her. They also told Ezell they were afraid to go to Robin's apartment because Holston might go there and hurt both of them. Ezell drove the sisters to Robin's coworker's home.

Robin told her coworker that Holston had threatened to kill Maria's dog if she stayed at Robin's home, so the sisters did not want to go back to Robin's home. Robin also said Holston threatened to kill both sisters if Robin tried to have Maria move out and live with Robin. The sisters spent the night at Robin's coworker's home. The day before Robin's murder, Robin told Ezell that Holston had lost his job and blamed Robin. Robin also told Ezell that Maria had made up with Holston and the two were thinking about moving to Texas together.

After Robin's murder, police interviewed Holston, and he admitted looking for Maria at her friends' homes and Robin's home the night of the argument. When he found Robin's door locked and nobody answered his knock, he went around to the back and climbed in through the bedroom window. He put the window in the bedroom, so the sisters would know he had been there and wiped off the windowsill. Holston's fingerprints were found on documents in the kitchen of Robin's apartment. Holston admitted this break-in was suspicious. But Holston ultimately denied murdering Robin, and Maria testified that Holston had been home with her the entire night of Robin's murder.

DISCUSSION

I

*The Trial Court Did Not Err in Excluding Evidence that Holston Had Committed Prior Acts of Domestic Violence Against His Two Ex-wives*

Defendant contends the trial court deprived him of his federal due process right to present a defense and state statutory right to present a defense when it excluded evidence that Holston had committed prior acts of domestic violence against his two ex-wives, Gretchen G. and Jennifer W. The trial court excluded this evidence under Evidence Code

6

section 352[1] because the probative value was outweighed by the probability that its admission would: (1) consume undue time when testimony would already establish Holston threatened Maria and Robin directly; and (2) create substantial danger of undue prejudice and misleading the jury because Holston acted more violently towards his ex-wives than he had with Maria. The trial court also excluded this evidence under section 1101, subdivision (a) because Holston's past violent acts were probative only of Holston's violent nature, and his violent nature was not admissible to prove he had killed Robin. We conclude the trial court did not violate defendant's constitutional rights or abuse its discretion in excluding this evidence.

## A

### *Additional Background*

Gretchen had been married to Holston at an unspecified time and had filed for divorce after only four months.[2] In those four months, Holston became very controlling, not allowing Gretchen to wear makeup, work, see friends, or leave the house. After about one month of marriage, Holston punched Gretchen in the face, breaking her nose and deviating her septum. After Holston hurt Gretchen a second time, she left him and moved in with her parents. Holston came to her parents' house and confronted her. He put a knife to her throat and threatened her. Gretchen knocked the knife out of Holston's hand and fell to the floor. Holston began trying to kick her in the face, causing lasting damage to her elbows, which she had used to protect her face. Gretchen's mother heard her screaming and told Holston to leave. He followed Gretchen's mother and left the house. Gretchen got a restraining order against Holston and initially pressed criminal

---

[1]     Undesignated statutory references are to the Evidence Code.

[2]     Gretchen's and Jennifer's proposed testimonies were from separate interviews between them and an investigator from the Sacramento County Public Defender's Office.

7

charges, but she later agreed to drop the criminal charges in return for him agreeing to the divorce.

Jennifer was married to Holston for approximately one year. During that time, one of Holston's friends falsely told him that he was in a relationship with Jennifer. Holston became jealous, grabbed a clothes iron from Jennifer, and pressed it against the skin of her arm, burning her and sending her to the hospital. Holston once threatened Jennifer with a gun. She divorced him because he was very physically abusive towards her.

B

*Analysis*

*1.    The Trial Court Did Not Violate Defendant's Constitutional Right to Present a Defense*

We begin by addressing defendant's contention that the trial court violated his constitutional right to present a defense by excluding this evidence. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) "[T]he Constitution leaves to the judges who must make these [evidentiary] decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 689-690.) The accused's right to present a defense is not infringed when a defendant is permitted to attempt to prove a third party committed a murder, but is "precluded from proving it with time-consuming hearsay and character evidence that was not particularly probative on the question." (*People v. Jones* (1998) 17 Cal.4th 279, 305 (*Jones I*).)

Here, defendant introduced evidence that Holston threatened to kill Robin and her sister only one week before Robin's murder and that the sisters went to stay at Robin's coworker's home because they feared Holston. Holston broke into Robin's apartment

8

that same night through the bedroom window, suspiciously wiping off the windowsill he had touched, and investigators later found Holston's fingerprints on papers in Robin's kitchen. Defendant's counsel used this evidence to argue extensively that Holston had killed Robin. The trial court precluded only marginally probative evidence, finding it would be unduly time consuming, unduly prejudicial and misleading to the jury, and improper character evidence. This does not rise to the level of "wholesale exclusion of [a] body of potentially exculpatory evidence" without "any rational justification." (*Crane v. Kentucky, supra*, 476 U.S. at p. 691.) The trial court therefore did not violate defendant's constitutional right to present a defense.

2.     *The Trial Court Did Not Violate Defendant's State Statutory Rights in Excluding This Evidence*

We next address defendant's contention the trial court violated his state statutory rights to present a defense under sections 1101, subdivision (a) and 352 by excluding this evidence. " ' " 'We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352.' " ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 610.) We will not reverse unless " ' " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Jones* (2017) 3 Cal.5th 583, 609 (*Jones II*).)

Under section 1101, subdivision (a), "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) "Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity." (*People v. Harris* (2013) 57 Cal.4th 804, 841; § 1101, subd. (b).)

9

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Where proposed evidence will "delve deeply" into a third party's past, a trial court does not abuse its discretion by "concluding that the evidence would require an undue consumption of time and mislead the jury." (*Jones I, supra*, 17 Cal.4th at p. 304.)

Here, the trial court reasonably found that having Holston's ex-wives detail their relationships with him would consume an undue amount of time, given that testimony of Holston's direct threats to Maria and Robin would be admitted into evidence. The trial court also reasonably found Holston's ex-wives' testimony would create a substantial danger of unduly prejudicing and misleading the jury because he had been significantly more violent with his ex-wives than with Maria. This reasoning tied into the trial court's exclusion of the evidence under section 1101, subdivision (a): Holston's conduct towards his ex-wives would convince the jury "Holsten was so violent that he must have killed Robin, which is nothing more than propensity evidence inadmissible under [section 1101, subdivision (a)]."

Defendant contends, to the contrary, the evidence would have proved Holston's motive to kill Robin to control Maria, as in *People v. Wang* (2020) 46 Cal.App.5th 1055. *Wang* is distinguishable. In *Wang*, the jury found the defendant guilty of murdering his wife's parents. (*Id.* at p. 1061.) The trial court admitted the wife's testimony that the defendant frequently started fights with her and "engaged in verbal abuse and threatened violence against [her] and her parents." (*Id.* at p. 1062.) Once, the defendant had punched his wife in the face during an argument, with her father stepping in to prevent the defendant from hitting her again. (*Id.* at pp. 1062, 1074.) The defendant argued that "the prior conduct lacked sufficient similarity to the charged conduct for admission under . . . section 1101, subdivision (b)." (*Id.* at p. 1077.) The appellate court noted "the prior

misconduct was probative of [the defendant]'s motive to kill [his wife]'s parents due to his desire to control [his wife]." (*Id.* at p. 1078.) The prior misconduct also involved the wife's parents, who were the victims in the case. (*Ibid.*) Accordingly, the court affirmed the trial court's admission of the prior acts of domestic violence. (*Ibid.*)

This case is distinguishable from *Wang* in three respects. First, the prior misconduct in *Wang* involved the eventual victims, unlike here, where Holston's ex-wives had no connection to Maria and Robin. Second, the methods Holston allegedly used were distinct. Holston did not threaten or harm his ex-wives' families, nor was Holston physically abusive with Maria. In fact, when Gretchen's mother interrupted Holston attacking Gretchen with a knife, Holston stopped and followed Gretchen's mother out of the house. By contrast, the defendant in *Wang* had frequently threatened his wife's parents during their arguments and then eventually carried out those threats. The analogous evidence in this case would be Holston's threats towards Maria and Robin that the trial court admitted. These distinctions support the trial court's finding that the jury was likely to understand Holston's conduct towards his ex-wives indicated Holston's violent nature, which could lead him to kill, rather than as probative of a motive for killing Robin. Such propensity evidence is inadmissible under section 1101, subdivision (a).

And third, defendant's reliance on *Wang* falters under the abuse of discretion standard. That the trial court in *Wang* did not abuse its discretion by admitting prior act evidence does not show the trial court here abused its discretion by precluding prior act evidence. "The trial court is vested with wide discretion in determining the admissibility of evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 637.) Because defendant has not met the high bar of establishing that the trial court acted in an arbitrary, capricious, or patently absurd manner, we conclude the trial court did not err by precluding testimony from Holston's ex-wives.

11

II

*The Trial Court Did Not Abuse Its Discretion in Admitting Records of Defendant's Access to Pornographic Web Sites*

Defendant contends the trial court abused its discretion by admitting testimony about records discovered on a hard drive found in his apartment that indicated a connected computer had accessed pornographic videos on the Internet in 2011 and 2012, with titles that mentioned the rape of tied or bound victims. Specifically, defendant contends the records from the hard drive lacked sufficient probative value to be admissible. The trial court found the evidence "probative of intent, motive and plan" and found the probative value was not substantially outweighed by the probability its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. The trial court did not abuse its discretion.

We review a trial court's rulings regarding admissibility under section 352 for abuse of discretion and will not reverse a ruling on such matters unless " ' " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Jones II, supra*, 3 Cal.5th at p. 609.) For a trial court to properly exclude relevant evidence under section 352, as defendant contends the trial court should have done here, its probative value must be "substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (§ 352.) "The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis, supra*, 46 Cal.3d at p. 638.) Rather, for a "substantial danger of undue prejudice" to "substantially outweigh[ ]" (§ 352) the probative value of the evidence, the evidence must "uniquely tend[ ] to evoke an emotional bias against defendant as an individual and [have] very little effect on the issues." (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

12

Here, as the trial court noted, the evidence showed Robin had been bound and raped. Sharon and Val also testified they were bound and raped. The Web site records admitted referenced women who were tied and raped. While we agree with the trial court that the remoteness in time between the rapes and the recorded Web site visits lessens their probative value, the evidence was probative of a common plan, motive, and intent. As the trial court noted, the jury could determine the records showed defendant's "enduring sexual interest in bondage and forced sex . . . ." And interest in nonconsensual sex was particularly relevant here, given defendant claimed to have had consensual sex with Robin. The evidence did not uniquely tend to evoke an emotional bias against defendant because: (1) the prosecution did not show the videos; (2) the investigator testified that the records mentioning women being tied and raped were found among records of over 5,000 visits to pornographic Web sites during the two-year period;[3] and (3) pornography is legal in the United States, as the trial court noted.

Defendant's citation to cases involving evidence of other *crimes* is not relevant here because " ' " 'substantial prejudicial effect [is] inherent in [such] evidence.' " ' " (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 244.) By contrast, the Web site records here did not show criminal conduct and were therefore not inherently prejudicial by the standards of the cases upon which defendant relies. Similarly, defendant's argument that "[t]he intent to kill was not in doubt" ignores the fact that Robin's consent and defendant's intent to rape her was contested. Finally, defendant's contention that the records could be from automatic pop-up windows, rather than Web sites defendant

---

[3] The trial court in its written ruling gave defendant the opportunity to introduce evidence that he had visited over 5,000 pornographic Web sites between 2011 and 2012 that did not depict "forced sex on women while tied up or bound" "to show a general interest in pornography in order to dissipate an inference that defendant had an exclusive interest in viewing pornographic websites depicting forced sex on women while tied up or bound." Defense counsel chose to elicit such testimony in his cross-examination.

intended to visit, is not sufficient to establish an abuse of discretion. Defendant was allowed to testify he did not remember watching these types of bondage videos, he did not do computer searches for these videos, and it was a "normal thing" to "encounter lots of pop ups on" pornographic Web sites. This testimony went to the weight of the evidence, not its admissibility.

We conclude the trial court did not abuse its discretion by admitting testimony about the pornographic Web sites.

DISPOSITION

The judgment is affirmed.


       /s/
       MESIWALA, J.


We concur:


 /s/
MAURO, Acting P. J.


 /s/
KRAUSE, J.

14